**Rodney DRIVER et al.**

v.

**Richard HELMS et al.**

**Civ. A. No. 75–224.**

United States District Court,
D. Rhode Island.

April 1, 1977.

---

See also D.C., 402 F.Supp. 683.

386

Charles Donnenfeld, Arent, Fox, Kintner, Plotkin, Kahn, Washington, D. C., Guy J. Wells, Providence, R. I., for Richard Helms.

Jacquelin A. Swords, Cadwalader, Wickersham & Taft, New York City, George M. Vetter, Jr., Providence, R. I., for James R. Schlesinger, Robert E. Cushman, Jr., Vernon A. Walters, William E. Colby and John A. Gronouski.

Walter H. Fleischer, Cole & Groner, Washington, D. C., for Richard Ober.

Donald J. Cohn, Webster, Sheffield, Fleishmann, Hitchcock & Brookfield, New York City, Alan T. Dworkin, Providence, R. I., for James Edward Day, Lawrence F. O'Brien, William Marvin Watson, McGeorge Bundy, Marshall S. Carter.

Plato Cacheris, Hundley, Cacheris & Sharp, P. C., Washington, D. C., for John N. Mitchell.

Jon T. Brown, Duncan, Brown, Weinberg & Palmer, Washington, D. C., for James J. Angleton and Ray Rocca.

Seymour Glanzer, Dickstein, Shapiro & Morin, Washington, D. C., for William J. Cotter.

Joseph V. Cavanagh, Providence, R. I., for Howard Osborn, Winton M. Blount, Elmer T. Klassen and Louis Patrick Gray, III.

Harry W. Asquith, Providence, R. I., for William F. Raborn, Jr., Rufus L. Taylor, Lyman B. Kirkpatrick, Jr., Lawrence K. White, Richard M. Bissell, Jr., Thomas Karamessines, Cord Meyer, William Hood and James Murphy.

Everett C. Sammartino, Asst. U. S. Atty., U. S. Dept. of Justice, D. Rhode Island, Providence, R. I., Rex E. Lee, Asst. Atty. Gen., John T. Boese, Office of Special Litigation, Civ. Div., U. S. Dept. of Justice, Washington, D. C., for United States and Clarence M. Kelley.

Melvin L. Wulf, American Civil Liberties Union Foundation, New York City, Richard W. Zacks, Providence, R. I., Burt Neuborne, New York City, for plaintiffs.

## OPINION

PETTINE, Chief Judge.

Plaintiffs are five American citizens who have brought this action on behalf of themselves and all those similarly situated against thirty present and former officials. The amended complaint alleges that the defendants "engaged in an extended conspiracy to conduct an illegal and unconstitutional program surreptitiously to intercept, open, read and photograph tens of thousands of sealed first-class letters deposited in the United States mails by plaintiffs and members of their class", thereby violating plaintiffs' rights under the First, Fourth, Fifth, and Ninth Amendments.[1] Plaintiffs seek declaratory and injunctive relief to operate against Defendant Clarence Kelley, Director of the Federal Bureau of Investigation; damages against each of the other defendants, sued in his individual and official, or former official, capacities; and certain other relief.[2]

Subject matter jurisdiction is invoked under 28 U.S.C. §§ 1331(a), 1339, 1343, 1361, and 5 U.S.C. § 702.

After extensive consultation with the parties, the Court issued an Order setting up a procedure for disposition of the expected deluge of preliminary motions. This Opinion, pursuant to that Order, disposes only of the individual defendants' motions to dismiss under Federal Rules of Civil Procedure 12(b)(2) (lack of jurisdiction over the person), 12(b)(3) (improper venue), and 12(b)(4) (insufficiency of process); of plaintiffs' motion to certify the class; and of the motions to dismiss Clarence Kelley.

Each defendant against whom damages are sought[3] has moved to dismiss for lack of personal jurisdiction and improper venue. Plaintiffs argue that this Court has jurisdiction over the persons of all defendants under 28 U.S.C. § 1391(e) and Rhode Island's long arm statute, Section 9-5-33, Rhode Island General Laws (1956), as amended, and that venue is proper under 28 U.S.C. § 1391(b) and (e).

*Personal Jurisdiction and 28 U.S.C. § 1391(e)*

Rule 4(f) of the Federal Rules of Civil Procedures provides for service of a district

---

1. Events giving rise to this lawsuit are described in the Report to the President by the Commission on CIA activities (June 6, 1975) (hereinafter referred to as the "Rockefeller Report"). *See also* Senate Select Committee to Study Governmental Operations with respect to Intelligence Activities, Final Report, Book III, 559–679, S.Rep.No.94–755, 94th Cong., 2nd Session (1976) (hereinafter referred to as the Final Report of the Select Committee).

2. The United States' motion to intervene as a party-defendant was granted on September 26,

1975. *See Driver v. Helms*, 402 F.Supp. 683 (1975) for earlier proceedings in this case. Damages are now sought against the United States directly under 28 U.S.C. § 1331(a). The Court will defer ruling on the pending Motion to Dismiss of the United States and will consider it together with the Motion to Dismiss of defendant U.S. in *Driver v. United States*, No. 76–297.

3. Except the United States. *See* note 2, *supra*.

court's process anywhere within the territorial limits of the state in which the district court is held and, when authorized by a statute of the United States, beyond the territorial limits of that state. Each of the defendants was served far outside the territorial limits of Rhode Island; to justify this process, plaintiffs contend that 28 U.S.C. § 1391(e) (1976) is a statute authorizing such national service of process in damage actions against present and former government officials acting under color of legal authority.

As plaintiffs point out, prior to the passage of § 1391(e) in 1962, citizens were unable to obtain effective relief for claims against federal officials arising from violations of federal law. Rule 4(f), F.R.Civ.P., prevented the federal courts from exercising personal jurisdiction over non-resident federal officials. And even if jurisdiction could be acquired pursuant to state law (long-arm statutes were just coming into general use at the time), venue in a federal question action would only lie in the district where all the defendants resided. *Compare* 28 U.S.C. § 1391(b) (1962 ed.) (venue where all defendants reside) with 28 U.S.C. § 1391(b) (Supp.1975) (adding venue "in the judicial district . . . in which the claim arose"). Thus, in cases where plaintiff's claim arose from the joint acts of federal officials who resided in different districts, citizens were forced to file separate suits against the defendants in the districts where they resided. In cases where a superior federal officer residing in Washington, D.C. was an "indispensable" party to an action, citizens were only able to litigate the claim in the District of Columbia, and were unable therefore to join a subordinate officer residing elsewhere who was equally necessary to the action. *See generally* 4 Wright and Miller, Federal

Practice and Procedure: Civil § 1107, at 417, (1969 ed., Supp.1976); 2 J. Moore, Federal Practice § 4.29, at 1209 (2d ed. 1975).

As a result of these obstacles, litigation against federal officials for redress of statutory and constitutional rights was "too expensive and inconvenient for many plaintiffs". Hart and Wechsler, The Federal Courts and the Federal System 1386 (1973).

To eliminate at least some of these obstacles and to enable citizens to obtain relief against official wrongdoing effectively, conveniently, efficiently, economically, and fairly, § 1391(e) was enacted in 1962. As the Senate Report stated, the purpose of the statute was "to provide readily available, inexpensive judicial remedies for the citizen who is aggrieved by the workings of Government". S.Rep.No.1992, 87th Cong., 2d Sess. 3 (1962). Section 1391(e) provides:

A civil action in which each defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, may, except as otherwise provided by law, be brought in any judicial district in which (1) a defendant in the action resides, or (2) the cause of action arose, or (3) any real property involved in the action is situated, or (4) the plaintiff resides if no real property is involved in the action.

The summons and complaint in such an action shall be served as provided by the Federal Rules of Civil Procedure except that the delivery of the summons and complaint to the officer or agency as required by the rules may be made by certified mail beyond the territorial limits of the district in which the action was brought.[4]

---

4. Sec. 1391(e) was enacted as part of the Mandamus and Venue Act of 1962. The legislative history is contained in H.R.Rep.No.536, 87th Cong., 1st Sess. (1961) [hereinafter H.Rep.]; S.Rep.No.1992, 87th Cong., 2d Sess. (1962), reprinted in 1962 *U. S. Code Cong. and Adm. News*, pp. 2785–2786 [hereinafter S.Rep.].

The Act of October 21, 1976, Pub.L. 94–574, § 3, amended § 1391(e), adding after the last sentence of the first paragraph the following:

Additional persons may be joined as parties to any such action in accordance with the Federal Rules of Civil Procedure and with such other venue requirements as would be

The defendants argue that § 1391(e)(1) does not supply personal jurisdiction (2) does not apply in actions for damages, (3) does not apply to officials sued in their "individual" capacity, and (4) does not apply to former federal officials. The Court turns to each of these arguments.

### 1. § 1391(e) supplies personal jurisdiction

■ This Court is of the firm opinion that § 1391(e) is indeed a statute authorizing nationwide jurisdiction which would be otherwise unavailable to a federal court bound by Rule 4(d). This opinion is shared by the great majority of courts, and all of the commentators, which have considered the question. And the legislative history of § 1391(e), while not a model of clarity, amply supports the Court's conclusion.

The House Committee Report accompanying § 1391(e) states:

In order to give effect to the broadened venue provision of this bill, it is necessary to modify the service requirements under the Federal Rules of Civil Procedure insofar as they apply to actions made possible by this bill. Rule 4(f) restricts effective service to the territorial limits of a State in which the district court is held unless a statute specifically provides for it to go beyond the territorial limits of that State. Since this bill is designed to make a Federal official or agency amenable to suit locally, the bill provides that the delivery of the summons and complaint to the officer or agency may be made by certified mail outside of the territorial limits of the district in which the action is brought.

H.Rep.No.536, 87th Cong., 2d Sess., at 4 (1962). Professor Moore agrees that subsection (e) both expands venue and extends the area in which the district court's process will run:

applicable if the United States or one of its officers, employees, or agencies were not a party.
This amendment was intended only to overrule the holdings of some courts that § 1391 was inapplicable when there were any non-federal defendants. *See* 105 Cong.Rec. S11352 (daily

[Sec. 1391(e)] realistically broadens venue in any civil action (not just mandamus proceedings) where each defendant is a federal officer, employee or agency and is sued for acts done in his official capacity or under color of legal authority; and provides for extraterritorial service of process, if necessary, in such an action. 2 J. Moore, Federal Practice, § 4.29, 1210 (2d ed. 1975).

*Accord,* 4 Wright and Miller, Federal Practice and Procedure, Civil § 1107 (1969 ed., Supp.1975).

The Second Circuit has stated that where § 1391(e) is applicable, it supplies both venue and *in personam* jurisdiction. *Liberation News Service v. Eastland,* 426 F.2d 1379 (2d Cir. 1970) (dicta). *Accord, Lowenstein v. Rooney,* 401 F.Supp. 952, 961–962 (S.D.N.Y. 1975); *Crowley v. United States,* 388 F.Supp. 981, 987 (E.D.Wis.1975); *Environmental Defense Fund, Inc. v. Froehlke,* 348 F.Supp. 338, 364 (W.D.Mo.1972), *aff'd on other grounds,* 477 F.2d 1033 (8th Cir. 1973); *English v. Town of Huntington,* 335 F.Supp. 1369, 1373 (E.D.N.Y.1970); *Macias v. Finch,* 324 F.Supp. 1252, 1254–1255 (N.D. Cal.1970); *Brotherhood of Locomotive Engineers v. Denver and R.G.W.R. Co.,* 290 F.Supp. 612, 615–616 (D.Colo.1968), *aff'd* 411 F.2d 1115 (10th Cir. 1969); *Powelton Civic Home Owners Ass'n v. Department of Housing and Urban Renewal,* 284 F.Supp. 809, 834 (E.D.Pa.1968). *See also Relf v. Gasch,* 167 U.S.App.D.C. 238, 511 F.2d 804, 808 (Robb, J., concurring).

Defendants argue that § 1391(e) speaks only to service of process, not to the exercise of personal jurisdiction, which they contend must be otherwise acquired. Typical of this line of argument is the following passage from the brief of Defendants Colby, Schlesinger, Cushman, and Walters, which the Court finds necessary to quote from at length:

The distinction between the mechanics of service of process and whether service is effective to confer personal jurisdiction is

ed. July 1, 1976), *citing Natural Resources Defense Council v. TVA,* 459 F.2d 255, 257 n. 3 (2d Cir. 1972). Having examined the legislative history of this amendment to § 1391(e), the Court does not believe that it in any way affects the conclusions here reached.

elementary and clear. Plaintiffs appear to treat the two together without an appreciation of the fact that two very different concepts are involved.

"Although Rule 4 [of the Federal Rules of Civil Procedure] is concerned with defining the various acceptable methods for effecting service of process, its operation cannot be understood without an appreciation of the history and current status of the law relating to the personal jurisdiction of the courts. This is true because underlying the question of service of process is the preliminary inquiry into whether the court has the power to summon a defendant before it to adjudicate a claim against him. * * * Rule 4 does not speak to this subject, which at present is governed primarily by the Supreme Court's interpretation of the Due Process Clause of the Constitution and the network of state and federal statutory provisions." 4 Wright and Miller, *Federal Practice and Procedure* (1969) at pp. 205–206.

Stated simply, the second paragraph of Section 1391(e) provides that in cases which fall within its scope, that is when jurisdiction is already present and venue is conferred by the first paragraph of Section 1391(e), the mechanics of service of process shall be "as provided by the Federal Rules of Civil Procedure" except those mechanics are modified to the extent that "delivery of the summons and complaint [under Rule 4(d)(5)] may be made by certified mail beyond the territorial limits of the district in which the action is brought". Such a modification of the method of service of process under the Federal Rules does not answer, as plaintiffs would have this Court believe, the "preliminary inquiry into whether the Court has the power to summon a defendant before it to adjudicate a claim against him". 4 Wright and Miller, *supra*, at p. 205.

Not at all dissimilar to this scheme is the operation of state service of process provisions such as the Rhode Island rules. Service of process is permitted by mail beyond the territorial limits of the Rhode Island courts, R.I.C.P., Rule 4(e), but this alone does not confer jurisdiction since before a defendant is amenable to such service and thereby subject to the jurisdiction of Rhode Island, he must have the "necessary contacts" with Rhode Island.

■ By applying to § 1391(e), analysis germane to jurisdiction under Rule 4, F.R. Civ.P. the defendants completely misperceive the nature of the problem at hand, and rely on an inapposite line of cases, e. g., *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *International Shoe Company v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). For those cases in which Congress has decided that the jurisdiction of federal courts shall be coextensive with the jurisdiction of the states in which they sit (that is, all cases directly ruled by Rule 4(d)), minimum contacts analysis is indeed in order. State courts may exercise jurisdiction only over defendants within their territory or over defendants who are deemed present within the territory by virtue of purposeful activity which constitutes such minimum contacts. *International Shoe, supra.*

■ However, Congress may provide for national service of process, i. e., national exercise of personal jurisdiction by each of the district courts based on presence of the defendant in the United States, rather than in any particular state. *Robertson v. Railroad Labor Board*, 268 U.S. 619, 45 S.Ct. 621, 69 L.Ed. 1119 (1925). *See Hart and Wechsler, supra*, at 1106. When Congress does so provide,[5] the district court's service is not constrained by the due process (*International Shoe, Hanson v. Denckla*) limits to which state courts are subject. *See Mar-*

---

**5.** For a partial list of other statutes which authorize federal courts to exercise national *in personam* jurisdiction, see 2 J. Moore, Federal Practice par. 4.33 at 1242 (2d ed. 1975); id. par. 4.42[1], at 1293.8–1293.10.

*iash v. Morrill,* 496 F.2d 1138, 1142–43 (2d Cir. 1974). Instead, the due process limitation on national service of process is found by inquiring into the fairness of such jurisdiction in the particular circumstances and facts of the case at hand, an inquiry mandated by the Fifth Amendment Due Process Clause. *Mariash v. Morrill, supra,* at 1142–43; *see also Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191, 198–205 (E.D.Pa.1974). *Cf. International Shoe, supra,* 326 U.S. at 320, 66 S.Ct. 154.

■■■ The Court believes that the exercise of national personal jurisdiction pursuant to § 1391(e) here is consistent with the applicable due process test. In *Mariash v. Morrill, supra,* the Second Circuit held that Congressionally authorized national jurisdiction satisfied due process if it was based on service calculated to inform the defendant of the proceedings in order that he may take advantage of the opportunity to be heard. As Chief Judge Kaufman noted, speaking for a panel including Associate Justice Clark, nation wide service of process, when authorized by Congress, is not extra-territorial at all. Therefore, the due process limitation on such process should be precisely the limitations applicable on a state's process within its territorial limits: notice calculated to inform the defendant of the pendency of the suit. *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).[6] Since it is undisputed that each of the defendants has been served according to the statute, and that such notice informed each defendant of the pendency of this suit so as to enable them to take advantage of the opportunity to be heard, the Court finds that the service effected comports with Due Process.

Defendants attempt to buttress their argument that § 1391(e) authorizes service only where *in personam* jurisdiction is otherwise acquired through minimum contacts by relying primarily on *Schlanger v. Seamans,* 401 U.S. 487, 91 S.Ct. 995, 28 L.Ed.2d 251 (1971), *Strait v. Laird,* 406 U.S. 341, 92 S.Ct. 1693, 32 L.Ed.2d 141 (1972), *Smith v. Campbell,* 450 F.2d 829 (9th Cir. 1971) and *Carney v. Laird,* 326 F.Supp. 741 (D.R.I. 1971), *aff'd,* 462 F.2d 606 (1st Cir. 1972). The Court finds these cases inapposite.

In *Schlanger v. Seamans, supra,* the Supreme Court held that an Arizona federal court was without jurisdiction to entertain a habeas corpus petition of an enlisted man in the Air Force who, although temporarily in Arizona, was under the custody of officials at Moody Air Force Base in Georgia.

The Court's rationale was simply that § 1391(e) did not apply to habeas corpus actions. The Court qualified its holding that jurisdiction over respondents in habeas corpus actions was territorial by observing:

> Although by 28 U.S.C. § 1391(e) (1964 Ed., Supp. V), Congress has provided for nationwide service of process in a "civil action in which each defendant is an officer or employee of the United States," the legislative history of that section is barren of any indication that Congress extended habeas corpus jurisdiction. . . . Though habeas corpus is technically "civil", it is not automatically sub-

---

6. Extra-territorial service of process must be based on necessary minimum contacts to satisfy due process. *International Shoe Company v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In *Oxford First Corp. v. PNC Liquidating Corp.,* 372 F.Supp. 191 (E.D.Pa.1974), the court went further, holding that the due process limits on *national* service of process should be governed by a five-part fairness test, incorporating a minimum contacts test. But *Oxford First* relied primarily on *Leasco Data Processing Equipment Corp. v. Maxwell,* 468 F.2d 1326 (2d Cir. 1972), which had required a showing of minimum contacts only because it was a true case of *extraterritorial service* of nationwide process—service under the Securities Act of 1934 on a foreign citizen living abroad. *See* the Second Circuit's explanation of *Leasco* in *Mariash v. Morrill,* 496 F.2d 1138, 1143 n. 9. For that reason, it was necessary to determine whether those citizens had the necessary "minimum contacts" with the United States. Thus the *Oxford First* court seems to have proceeded on an incorrect premise; as Chief Judge Kaufman has made clear, Congressionally authorized nationwide service (as opposed to extraterritorial service) must meet only the requirements of *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), not those of *International Shoe, supra.* *See Mariash v. Morrill,* 496 F.2d 1138, 1143 n. 9.

ject to all the rules governing ordinary civil actions. (citations omitted) 401 U.S. at 490 n. 4, 91 S.Ct. at 997.

Section 1391(e) applies to actions against government officers "except as otherwise provided by law". The Court found in *Schlanger* that the habeas corpus statute, 28 U.S.C. § 2241, did indeed provide otherwise. Therefore, § 1391(e) did not apply, and a district court's reach of *in personam* jurisdiction in habeas corpus actions was limited to the traditional territorial jurisdiction of the district courts.

The other habeas corpus decisions cited by the defendants follow from the rule established in *Schlanger, supra,* and establish only the proposition that § 1391(e) is unavailable to establish personal jurisdiction in habeas corpus actions. *See* 4 Wright and Miller, Federal Practice and Procedure, § 1107, at 89 (Supp.1975). In *Strait v. Laird, supra,* the Court held that the territorial jurisdiction of the district court for habeas corpus actions could be justified by using the respondent's minimum contacts in the district to impute his presence there. The Court did not find it appropriate to cite or discuss § 1391(e) at all, basing its decision on its interpretation of 28 U.S.C. § 2241. In *Carney v. Laird, supra,* this Court relied on *Schlanger,* holding that § 1391(e) did not extend the habeas corpus jurisdiction of the district courts. That opinion did not consider, much less decide, whether § 1391(e) authorized the exercise of *in personam* jurisdiction beyond the limits provided by Rhode Island's long arm statute in civil actions other than habeas corpus. *Carney v. Laird, supra,* at 744.

*Smith v. Campbell, supra,* cited by many of the defendants, appears to support their contention that § 1391(e) is unavailable to ground personal jurisdiction in civil actions.[7] However, *Smith* too was a habeas corpus action, relying on the rule of *Schlanger v. Seamans.* The dicta so heavily relied on by defendants appears to have exactly the same meaning as this Court's observations in *Carney v. Laird, supra.* To the extent that the Ninth Circuit meant to generalize its position to civil actions other than habeas corpus, this Court is in disagreement, and respectfully declines to follow.

## 2. Section 1391(e) applies to damage actions

Defendants make two related claims which bear on the question whether the liberalized terms for securing personal jurisdiction under § 1391(e) can be invoked in actions for damages against current federal officials. First, they argue that § 1391(e) pertains only to actions in the nature of mandamus against government employees under 28 U.S.C. § 1361. Second, they contend that § 1391(e) does not apply to defendants sued in their "individual" capacities. The Court will consider each of these arguments in turn.

### a. Section 1391(e) applies to damages actions as well as mandamus actions.

■ Section 1391(e), by its terms applies to any civil action in which "a defendant is an officer or employee of the United States . . . acting in his official capacity or under color of legal authority". On its face, then, § 1391(e) covers far more than mandamus actions. However, the Supreme Court has held that habeas corpus actions do not fall within § 1391(e), *Schlanger v. Seamans, supra,* 401 U.S. at 490 n. 4, 91 S.Ct. 995 and this Court must decide whether the subsection is inapplicable to damage actions as well.

Defendants rely on the legislative history of § 1391(e) for their argument that Congress meant to restrict its application to mandamus actions. There is no doubt that the legislative history can be read to support such a position. However, the Court believes that properly read the legislative history makes it clear that § 1391(e) refers to damage actions as well as mandamus actions.

7. "Section 1391 may not be utilized to confer jurisdiction, but can be in order to effectuate jurisdiction once it has attached." 450 F.2d at 834.

At the outset, the Court wishes to emphasize what should be apparent. If Congress wanted to limit the application of § 1391(e) to mandamus actions, the statutory language it chose was extraordinarily ill-fitted to that task. The subsection applies to "a civil action in which [each] defendant is an officer . . .", not to "any action in the nature of mandamus . . ." which was the language Congress used in 28 U.S.C. § 1361, a statute passed together with § 1391(e). Congress has demonstrated its ample ability to distinguish between civil actions in general and mandamus actions in particular, and this Court believes that the legislative history contradicting the plain meaning of the subsection would have to be unusually clear and persuasive to warrant adoption of a reading which a) is opposed to the plain meaning of the words of the subsection, and b) attributes such carelessness to Congress. The Court therefore turns to the legislative history, and to an attempt to discern "the mischief" at which § 1391(e) was directed.

The Mandamus and Venue Act of 1962 contained two "entirely different subjects",[8] according to then-Deputy Attorney General Byron R. White, whose letter so stating to Senator Eastland, Chairman of the Senate Judiciary Committee, appears in the official legislative history. *See* U.S. Code Cong. and Adm.News, 87th Cong., 2nd Sess., at 2789 (1962). First, in what is now 28 U.S.C. § 1361, Congress facilitated review of administrative actions by abrogating the ancient rule by which only the district court for the District of Columbia had jurisdiction to mandamus federal officers. *See Liberation News Service v. Eastland, supra* at 1383. As Judge Friendly has noted, "this jurisdictional change . . . became the main subject of Congressional and executive concern". *Id.* Second, in what became 28 U.S.C. § 1391(e), Congress authorized broadened venue and national service of process in civil actions against employees of the United States "acting in . . . official capacity or under color of legal authority". S.Rep.No.1992, 1962 U.S. Code Cong. and Adm.News, *supra*, at 2786.

The presence of these two separate subjects accounts for the difficulties caused by the legislative history, which makes sense only on the understanding that § 1391(e), but not § 1361, extends beyond mandamus actions. Both the House and Senate Reports contain the following paragraph, in identical words:

> The venue problem also arises in an action against a Government official seeking damages from him for actions which are claimed to be without legal authority but which were taken by the official in the course of performing his duty.
>
> H.Rep. at 3; S.Rep. at 3.

*Hart and Wechsler, supra*, at 1388, say that "A literal reading of the statutory language would make the section applicable to all types of 'civil actions' against federal officers, and that is precisely how most courts have construed § 1391(e)." Professor Moore agrees:

> . . . [Sec. 1391(e)] realistically broadens venue in any civil action (not just mandamus proceedings) where each defendant is a federal officer, employee, or agency and is sued for acts done in his official capacity or under color of legal authority; and provides for extraterritorial service of process, if necessary, in such an action.

8. There is clearly a contradiction between the recognition by the Department of Justice that §§ 1361 and 1391(e) covered "entirely different subject[s]" and Judge Friendly's admonition that §§ 1361 and 1391(e) must be read together. *See Natural Resources Defense Council v. TVA*, 459 F.2d 255, 258 (2d Cir. 1972). Defendants rely on Judge Friendly's dictum to argue that § 1391(e) only authorizes service and jurisdiction in actions made possible by § 1361—that is, mandamus actions. As the House Report states,

> this bill is not intended to give access to the federal court to an action which cannot now be brought against a federal official in the United States District Court for the District of Columbia.

H.Rep.No.536, 87th Cong., 2d Sess., at 2. However, for reasons stated below in the text, this Court finds the language of the House Report refers only to the subject matter jurisdiction conferred in Section 1 of the bill, which became § 1361. *See also* Cramton, Nonstatutory Review of Federal Administrative Action, 68 Mich.L.Rev. 387, 453 (1970), and *infra* n. 10.

2 Moore, Federal Practice, paragraph 4.29, 1210 (2d ed. 1971)

As plaintiffs demonstrate, numerous courts have applied the statute to a variety of settings where the complaint sought monetary relief for the violation of constitutional rights. In *Ellingburg v. Connett*, 457 F.2d 240, 241 (5th Cir. 1972), the Fifth Circuit held that § 1391(e) applies to a damage action by a federal prisoner against prison officials for unconstitutional treatment. *See also Patmore v. Carlson*, 392 F.Supp. 737, 739–740 (E.D.Ill.1975). In *Lowenstein v. Rooney*, 401 F.Supp. 952 (S.D.N.Y.1975), the court applied § 1391(e) to a damage claim against present and former officials for violating plaintiff's constitutional rights. In *Briggs v. Goodwin*, 384 F.Supp. 1228, 1230 (D.D.C.1974), the court applied § 1391(e) to a damage action arising out of the unlawful conduct of federal prosecutors in a criminal case. *Wu v. Keeney*, 384 F.Supp. 1161 (D.D.C.1974) and *Green v. Laird*, 357 F.Supp. 227 (N.D.Ill.1973) also recognized the applicability of § 1391(e) to damage actions.[9] *See also* Jacoby, The Effect of Recent Changes in the Law of "Nonstatutory" Judicial Review, 53 Georgetown L.J. 19, 36–37 (§ 1391(e) applicable to damage suits against officers acting under color of legal authority); Cramton, Nonstatutory Review of Federal Administrative Action, 68 Mich.L.Rev. 387, 455 (1970) (same).[10]

Against this strong authority, defendants make a series of arguments based primarily on the fact that § 1391(e) was passed jointly with the Mandamus Act, 28 U.S.C. § 1361. They rely on the following language in the legislative history:

> The purpose of this bill, as amended, is to make it possible to bring actions against Government officials and agencies in U.S. district courts outside the District of Columbia, which because of certain existing limitations on jurisdiction and venue, may now be brought only in the U.S. District Court for the District of Columbia . . . This bill will not give access to the Federal courts to an action which cannot now be brought against a Federal official in the U.S. District Court for the District of Columbia. S.Rep.1992, *supra*, at 2; 1962 U.S.Code Cong. and Adm.News, *supra*, at 2784–85.

Since the present action was not cognizable only in the District of Columbia prior to the passage of the Mandamus and Venue Act of 1962, the argument goes, the statute cannot encompass this claim.

There are a number of crucial errors in this line of reasoning.

First, the defendants argue that this action could have been brought in any district "where the claim arose", and for that further reason is not an action which could only have been brought in the District of Columbia before passage of Section 1391(e). However, as plaintiffs observe, that venue provision did not exist until 1966, when 28 U.S.C. § 1391(b) was amended. Moreover § 1391(e)(1) provides venue in the district where *one* of the defendants resides. If the defendants may reside in more than one district, then all the defendants need not reside in the District of Columbia. Thus, subsection (e)(1) contemplates actions against individuals who do not reside in the District of Columbia and therefore could not have been sued there prior to the enactment of § 1391(e).

A close reading of the legislative history convinces the Court that the language cited

**9.** While some of the above-cited cases fail directly to address the issue, in each of them a close reading makes it clear that the court of necessity relied on § 1391(e) to ground at least venue, and usually jurisdiction as well, in a damage action. This Court rejects the suggestion of some defendants that this authority is worthless by virtue of those courts' failure to focus in on the problem, at least where so many courts made the same "mistake" and where each of the defendants was presumably represented by counsel from the Department of Justice, who would have been alerted to § 1391(e)'s potential for reaching damage actions from the outset. *See* fn. 22, *infra*.

**10.** The Court notes that Dean Cramton has been publicly recognized by the Senate as the craftsman of the revisions of § 1391(e). *See* 105 Cong.Rec. S11532 (daily ed. July 1, 1976). His views are therefore of considerable weight and importance.

by defendants was addressed not to the entire bill but solely to the mandamus section. In his letter to Senator Eastland, then-Deputy Attorney General White expressed the concern of the Justice Department that the act might be construed to extend the mandamus power to instances where there was no clear legal duty:

> Courts interpreting the mandate to require a Federal officer "to do his duty" might find a much greater power intended than the existing mandamus power in the District of Columbia court to which the proposed statute does not refer explicitly or implicitly. S.Rep., *supra*, at 6; 1962 U.S.Code Cong. and Adm.News, *supra*, at 2788.

In response to this concern, the Senate Committee added clarifying language to § 1361, and inserted in its Report the above-cited language, limiting the new mandamus subject-matter jurisdiction of the district courts to the power which had previously existed in the District of Columbia. This limitation was not addressed to that part of the bill which became 28 U.S.C. § 1391(e).

It is noteworthy that the Deputy Attorney General's letter had gone on to suggest tying section 2 of the bill, (now § 1391(e)), to the Administrative Procedure Act, to ". . . unquestionably eliminate[s] suits for money judgements against officers . . ." S.Rep.1992, *supra*, at 6; U.S.Code Cong. and Adm.News, *supra*, at 2789.

Although Congress adopted White's other suggestions it refused to act on this one. While such Congressional inaction is of course not dispositive, the fact that Congress was made aware of the construction which § 1391(e) invited is telling. The Court finds this additional support for its conclusion that the statements in each Report, that the venue and jurisdictional problem of suing federal officers for damages would be solved by § 1391(e), indeed say what they seem to say.

In summary, the legislative history clearly states that the venue provisions were intended to overturn the decisions by which citizens seeking relief against government officials were forced to sue in Washington, D.C. by virtue of the the then-operative federal question venue statute (venue was available only where all defendants resided)[11] and the indispensable party rule (even where the defendant official was in plaintiff's local district, a superior officer in Washington found indispensable would defeat the action, since venue would be improper in the home district.) *See* S.Rep., *supra* at 2–3, U.S.Code Cong. and Adm. News, *supra*, at 2786. *See also* 4 Wright and Miller § 1107, *supra* at 419–420. The same history specifically includes damage actions in the catalogue of "mischiefs" to be remedied. It is therefore not surprising that defendants have not cited a single case which holds that § 1391(e) is inapplicable to damage actions.[12]

The Court can only conclude, therefore, that § 1391(e) does indeed apply to damage actions. Whether it applies to actions seeking damages against officials as individuals, and where those officials are *former* employees, remain to be considered.

b. *Section 1391(e) applies to defendants sued in their "individual" capacities for actions accomplished under color of legal authority.*

■ All the defendants to whom the plaintiffs look to recover money damages for the violation of their constitutional rights, are sued in their "individual" capacity, and also in their "official" or "former official" capacity, as the case may be (de-

---

11. Since venue in federal question cases at the time § 1391(e) was passed was available only where defendants resided, *see supra* at 2, the great majority of the defendants here could have been sued only in Washington, D.C. under that former venue statute. Therefore, if Congress intended § 1391(e) to apply only to actions which, at the time of its passage, could be brought in Washington, D.C., many of the pending motions to dismiss would still have to be denied.

12. Defendants do cite authority that § 1391(e) is inapplicable to damage actions brought against defendants individually. *See* part 2(b), *infra*.

pending on whether they are or are not now in government employ). But it is the "individual" capacity which allows recovery of money damages. That designation satisfies the fiction which was first adopted in *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), in order to overcome the impediment of sovereign immunity. Its purpose is to characterize the illegal or unconstitutional acts of government officials done under color of legal authority (i. e., in the course of employment), as their own for which they may incur liability. As it was specifically put in *Ex Parte Young*:

> If the act which the [official] seeks to enforce be a violation of the federal Constitution, the officer in proceeding under such an enactment comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. 209 U.S. at 159–60, 28 S.Ct. at 454 (emphasis added).[13]

Acknowledgement of the fiction, and its function, is explicitly contained in § 1391(e) which uses the language "under color of legal authority".[14]

The House Committee Report explained the significance of the phrase (H.R.Rep. pp. 3–4):

> By including the officer or employee, both in his official capacity and acting under color of legal authority, the committee intends to make the proposed section 1391(e) applicable not only to those cases where an action may be brought against an officer or employee in his official capacity. It intends to include also those cases where the action is nominally brought against the officer in his individual capacity even though he was acting within the apparent scope of his authori-

ty and not as a private citizen. Such actions are also in essence against the United States but are brought against the officer or employee as an individual only to circumvent what remains of the doctrine of sovereign immunity. Considerations of policy which demand that an action against an official may be brought locally rather than in the District of Columbia require similar venue provisions where the action is based upon the fiction that the officer is acting as an individual. There is no intention, however, to alter the venue requirements of Federal law insofar as suits resulting from the official's private actions are concerned. *Id.* at 3–4.

Defendants agree that damages can be awarded against them only in their individual capacities. However, they contend that § 1391(e) does not authorize jurisdiction or venue in damage suits against federal officers sued in their individual capacities, citing *Relf v. Gasch*, 167 U.S.App.D.C. 238, 511 F.2d 804, 807 n. 15 (1975) and *Paley v. Wolk*, 262 F.Supp. 640, 643 (N.D.Ill.1965), *cert. denied*, 386 U.S. 963, 87 S.Ct. 1031, 18 L.Ed.2d 112 (1967).

In *Relf v. Gasch, supra*, plaintiffs sought to mandamus a district judge in the District of Columbia to prevent a transfer of a lawsuit from Washington, D.C. to Alabama. The underlying suit was against federal officials residing in Washington. The Court of Appeals granted the mandamus, finding that venue would not exist in Alabama under § 1391(e), by holding that § 1391(e) was inapplicable where damages were sought against defendants as individuals. The only authority the Court gave for this proposition was *Paley v. Wolk, supra*.

In *Paley v. Wolk, supra*, plaintiff claimed that federal patent officers were involved

---

**13.** Though *Ex Parte Young* was an action to enjoin a state official, the fiction has been transported to apply to federal officials, *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949), and to actions for money damages. *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (state officials); *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (federal officials).

**14.** The phrase was inserted over the objection of the Justice Department, which argued for the statute's limitation to acts done in an official capacity. Jacoby, *Nonstatutory Judicial Review*, 53 Geo.L.J. 19, 32–33 (1964).

in a "confidence game" to pocket plaintiff's patent application fees. The court concluded that the action arose out of essentially private acts for private gain, that the wrongful acts were not done in the course of the defendant's duties, and that § 1391(e) did therefore not apply. 262 F.Supp. at 643.

With due respect, this Court believes that the *Relf* decision is insupportable in light of the language of § 1391(e), the legislative intent discussed *supra,* and the *Paley* case. *Paley* simply tracks the language of § 1391(e), holding that the subsection is available only when acts complained of are performed "under color of legal authority". The acts complained of in *Paley* were found not to be performed "under color of legal authority". In *Relf,* however, as here, it is clear that plaintiffs were complaining of precisely such acts as are covered by the terms of § 1391(e). *See* Hart and Wechsler, *supra,* at 1388; S.Rep., *supra,* at 3. Contrary to defendants' contentions and *Relf,* § 1391(e) does not exclude all damage actions against officers sued individually. It excludes damage actions against officers sued individually when those acts are not accomplished under color of legal authority —i. e., when the acts complained of are private acts accomplished for private gain.[15] This reading fully conforms to the congressional intention in passing § 1391(e), which was to facilitate suits seeking redress against the misuse of governmental power.

Under the defendants' theory, the portions of the Senate and House reports which specifically place damage actions within the reach of § 1391(e) are meaningless.[16] The only actions they believe that language contemplates are actions

such as those against tax collectors which are against the government official in his "personal" capacity, not his official capacity . . . since otherwise they would be barred by the doctrine of sovereign immunity.

Reply memorandum of defendants Colby, Schlesinger, Cushman and Walters, at 10. However, the legislative history specifically removes actions against tax collectors from the reach of § 1391(e):

The committee also approved an amendment to section 2 of the bill providing that the provision with respect to venue should apply only to the extent that is not otherwise provided by law. Examples of such proceedings covered by this provision are proceedings with respect to federal taxes.

S.Rep.No.1992, *supra,* 4; U.S.Code Cong. and Adm.News, *supra,* at 2787. Defendants have not suggested damage actions other than the clearly-excluded tax refund actions to which Congress might have been addressing itself.

In essence, defendants attempt to break down the fiction which authorizes both injunctive relief and damages against federal officers when such relief would not be available against the United States. As Defendant Helms puts it:

Plaintiffs would have this Court believe that a suit against a defendant "individually" is the *equivalent* of a suit against that defendant for actions "under color of legal authority." This contention defies common sense and English usage. Plaintiffs themselves admit that Section 1391(e) covers only suits which would oth-

---

15. *See, e. g., Griffith v. Nixon,* 518 F.2d 1195 (2d Cir. 1975), dismissed for lack of jurisdiction because the acts complained of were, like those in *Paley v. Wolk, supra,* private acts done for private gain. This distinction is made in other areas of the law relating to public officials. *See, e. g., United States v. Ehrlichman* 546 F.2d 910, 921 (D.C.Cir.1976) where the court stated: There is no violation of Section 242 [42 U.S.C. § 242], however, if a sheriff and his deputies commit a murder for purely personal, non-governmental reasons. The state can, and should, deal with such crime. Section 242 comes into play only if the object of

the murder . . . [arose from some] purpose stemming from the official position of those committing the homicide.

16. "The venue problem also arises in an action against a Government official seeking damages from him for actions which are claimed to be without legal authority but which were taken by the official in the course of performing his duty."
H.Rep.No.536, 87th Cong., 1st Sess., at 3; S.Rep.No.1992, 87th Cong., 2nd Sess., at 3.

erwise be unconsented suits against the sovereign, but which are maintainable against Federal officials as nominal defendants through a "fiction". But, a suit against a former officer, seeking damages from his personal estate, is the very antithesis of a suit against the Government. Thus Plaintiffs' own analysis of Section 1391(e) proves the inapplicability of the provision here.

To the contrary, permitting damage suits against officers "individually" for harm resulting from actions accomplished under color of the government's legal authority tracks precisely the methodology adopted in *Ex Parte Young, supra,* and subsequent cases. Such suits enable citizens to remedy harms to them and to deter government officials in the future from misusing the legal authority entrusted to them. The legislative history of § 1391(e) is replete with reference to precisely these concerns. The result is not inequitable. If defendants can establish a good-faith defense, it will be available to them. However, should they be unable to establish such a defense, it would be a serious injustice to throw up hurdles against a lawsuit in a single, convenient forum which Congress has authorized as a "readily available, inexpensive judicial remed[y] for the citizen who is aggrieved by the workings of government." S.Rep.1992, *supra,* at 3.[17]

### 3. Section 1391(e) Applies to Former Officials

■ As a critical portion of their argument to avoid the Court's jurisdiction, defendants who were employed by the United States in the past, but who were no longer employed by the United States at the time they were served with process in this suit,[18] maintain that § 1391(e) does not apply to former federal officials but only to officials who were employed by the United States at the time they were served with process in this suit. The arguments they make persuaded Judge Renfrew, in a similar case involving many of the same defendants, to hold that § 1391(e) applied solely to present, not former, officials. *Kipperman v. McCone,* 422 F.Supp. 860, 876–77 (N.D.Cal. 1976).

Judge Renfrew began by noting that the plain language of the statute denotes "an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority." The court then proceeded to the legislative history which it found decisive, suggesting "no intent on the part of Congress to include former officials among those subject to suit under Section 1391(e)". *Id.* at 876. As Judge Renfrew read the legislative history, only those individuals subject to mandamus—present officials—would fall within the scope of the subsection. He found it "inconceivable that Congress would so substantially broaden the venue provision applicable to every individual once employed

**17.** Defendant Cotter argues that there is no need to look to the legislative history of § 1391(e) because the statute is clear on its face. He contends that resort to the legislative history, and an attempt to construe the subsection in light of Congressional intent, is particularly inappropriate since the "literal" reading he offers will, he asserts, leave plaintiff with appropriate forums for this lawsuit in the Southern District of New York, the site of the mail openings, and the Eastern District of Virginia, headquarters of the CIA. Whether or not jurisdiction over all defendants would exist in those forums now, it is relevant in deciding what Congress intended by passing § 1391(e), that when § 1391(e) was enacted, this lawsuit could not have been brought in either of them. *See* 28 U.S.C. § 1391(b) (1962 ed.).

Although courts have disagreed about the proper construction of § 1391(e), they have been virtually unanimous in agreeing that the statute is not clear on its face, and required a resort to legislative history. *See, e. g., Natural Resources Defense Council v. TVA,* 459 F.2d 255, 257–59 (2d Cir. 1972); *Powelton Civil Home Own. Ass'n. v. Department of Housing and Urban Development,* 284 F.Supp. 809, 833 (1968).

**18.** Those defendants are Raborn, Carter, Taylor, White, Bissell, Karamessines, Angleton, Hood, Rocca, Osborn, Murphy, Day, O'Brien, Watson, Blount, Klassen, Cotter, Gray, Mitchell, Bundy, and O'Brien. Defendant Kirkpatrick is a former official but is a resident of Rhode Island. Defendants Helms, Schlessinger, Colby, Meyer, Ober, Walters and Kelley are, or were at the time they were served, employees of the United States.

by the federal government without comment". *Id.*, at 877.[19]

The *Kipperman* court's decision regarding the reach of § 1391(e) is squarely in conflict with the decision in *Lowenstein v. Rooney*, 401 F.Supp. 952 (S.D.N.Y.1975). Lowenstein sought declaratory and injunctive relief and damages from various present and former officials for their alleged improper and unlawful conduct toward him, consisting of, *inter alia*, improper investigations, and a politically motivated IRS investigation. In response to the motions of various defendants to dismiss because § 1391(e) did not apply to former officials, the court canvassed the legislative history of § 1391(e), and then stated:

> The actions complained of by the plaintiff clearly were committed "under color of legal authority". To assert that because the defendants are no longer in government service the plaintiff may not utilize section 1391(e)—a section clearly intended to permit such actions—would as plaintiff contends, defeat the purposes of the statute. If the defendants desire to invoke official immunity, they may do so directly. *Lowenstein v. Rooney, supra*, at 962.

This Court is persuaded that the holding of *Lowenstein* more fully conforms to the policies behind the adoption of the broadened venue and service provisions of § 1391(e) than the holding in *Kipperman*.

First, the reasoning urged by defendants would permit an official to defeat an action against him for illegal acts accomplished under color of legal authority merely by resigning his position. *See Lowenstein v. Rooney, supra*, at 961.[20] And such reasoning creates its own difficulties with regard to officials who, while still in government service, have changed jobs.

Second, it seems clear that Congress intended by § 1391(e) to facilitate private suits for redress of governmental action. Yet defendants' construction would require plaintiffs seeking relief to maintain multiple lawsuits in widely scattered jurisdictions, each involving the same facts and issues. That result seems at odds with the Congressional intent in enacting Section 1391(e), "a plaintiff's provision", *Powelton Civil Home Owners Ass'n. v. Dept. of Housing and Urban Dev., supra* at 833.

The final reason advanced by defendants against reading § 1391(e) as applying to former officials is that it would unduly burden government service. As the *Kipperman* court observed:

> The construction urged by plaintiff would potentially subject a retired government official to suit in any federal court in the country . . . The Court finds it inconceivable that Congress would so substantially broaden the venue provision applicable to every individual once employed by the federal government without comment. *Kipperman v. McCone, supra*, at 877.

However, since it is undisputed that Congress subjected *present* government officials to suit in any federal court under § 1391(e), it is necessary to determine exactly how much of an added burden the construction proferred by plaintiffs would place on retired officials. The Court must ascertain the Congressional intention in § 1391(e). If the plaintiff's construction would entail a significant added burden on government service, that would be persuasive reason to conclude that Congress would not have taken such a step without comment.[21]

The Court has examined defendants' arguments and fails to perceive any significant burden of federal service *added* by construing § 1391(e) to apply to former

---

**19.** In *Wu v. Keeney*, 384 F.Supp. 1161 (D.D.C. 1974), a damage action where jurisdiction was based on § 1391(e) was dismissed solely on this ground.

**20.** Plaintiff points out that defendant Cotter resigned the same month this lawsuit was filed.

**21.** For example, Defendant Bundy contends that construing § 1391(e) to include former government officials would "be patently unfair and would impose an impossible burden on government service". Bundy Memorandum at 10. He argues that plaintiff's construction would deter able men from entering federal service. Id. at 13.

officials. Certainly personal liability itself is not such an added burden, since government service is already burdened with personal liability beyond the reach of official immunity. *See, e. g., Halperin v. Kissinger,* 424 F.Supp. 838 (D.D.C.1976). Neither Congress nor the courts have found that subjecting government officials to such liability impedes the proper functioning of the government. To the extent that such liability deters wrongful acts, that of course is its purpose. Nor does the Court believe that able men and women would be deterred from entering federal service if their liability were not terminated by their withdrawal from the government. Few men or women know how long they will be in government service when they enter: the interest in cutting off liability is served by statutes of limitations, which fairly mitigate such burdens as exist for all officials, in or out of government.

Nor does the Court find significant added burdens on federal service in defending such lawsuits. As plaintiff points out, the principal burden of defending any lawsuit is the expense of counsel. But it seems to be undisputed that it is the policy of the Justice Department to defend lawsuits against present and former officials by citizens claiming redress for actions accomplished under color of legal authority. The record here shows that the Justice Department has retained private counsel to represent each of the defendants.[22] Indeed, this palpable manifestation of the continuing relationship between the government and its former officials strengthens plaintiffs' argument, and demonstrates the continuing responsibility which the United States bears for acts committed under color of law by persons formerly in the service of government. As for other burdens of defending the lawsuit, apart from counsel and ultimate liability, it is clear that these are insignificant. By far the greatest portion of effort required in defending this lawsuit will not require defendants to travel or undertake other actions interfering with their ongoing activities.

Since the Court cannot find significant burdens placed on former employees in defending lawsuits such as these under government expense, other than those burdens which employees of the government are all aware they face (i. e., liability for wrongful acts accomplished by misuse of official power), it agrees with the *Lowenstein* court that the proper construction of § 1391(e) renders it applicable to present and former officials alike.

### Venue under Section 1391(e)

■ The arguments defendants make concerning § 1391(e)'s inapplicability to damage actions against former officials apply to venue as well as to personal jurisdiction. Since the Court holds that § 1391(e) authorizes the exercise of personal jurisdiction in light of the allegations in the complaint, it necessarily holds that § 1391(e) supplies venue as well.[23]

### Specificity of Allegations

■ Various defendants contend that the complaint fails to allege specific facts connecting them with Rhode Island. The case they rely on, *Socialist Workers' Party v. Attorney General of the United States,* 375 F.Supp. 318 (S.D.N.Y.1974) holds that

22. A press release issued by the Department of Justice on December 12, 1975, and attached to plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss the Complaint, states:

> The Department . . . usually would represent all the present and former employees for actions they took while federal officials.

Since the Department has been conducting a criminal investigation of the mail-opening program, representation of these defendants would have created a conflict of interest, and the government decided instead to retain private counsel for each of the defendants here.

23. Plaintiffs have also sought to ground jurisdiction on Rhode Island's long-arm statute, Section 9–5–33, Rhode Island General Laws (1956), basing venue on 28 U.S.C. § 1391(b). However, since the Court has found jurisdiction and venue for all plaintiffs under 28 U.S.C. § 1391(e), and since Rhode Island's long-arm statute could ground jurisdiction at most for plaintiff Driver, the Court does not reach these issues.

New York's long-arm statute requires a plaintiff suing an out-of-state defendant under a conspiracy theory to allege "definite evidentiary facts" connecting the defendant to transactions occurring in New York to subject him to New York jurisdiction. *Id.* at 322.

Since the Court holds that Rhode Island's long-arm statute provides no limitation on the court's exercise of jurisdiction over defendants sued pursuant to § 1391(e), the *Socialist Workers* case is inapposite. Plaintiffs have pleaded the only forum-related activity which they must plead to establish personal jurisdiction: activity within the forum, i. e., the United States.

To the extent that defendants contend that the complaint fails properly to allege sufficiently specific facts regarding acts of defendants which have harmed plaintiffs, a different question is presented.[24] The Court has already indicated its intention to entertain motions under Rule 12(b)(6) at a later date.

*Motion to Dismiss of Defendant Kelley*

██ Plaintiffs seek injunction "enjoining the defendants from engaging in the activities declared to be illegal and unconstitutional" against Defendant Clarence Kelley, the Director of the Federal Bureau of Investigation, and

A mandatory injunction or writ of mandamus ordering the defendants to produce before this Court for destruction, all files, reports, records, photographs, data computer tapes and cards, and all other materials derived from defendants' illegal and unconstitutional activities relating to

plaintiffs and all other persons similarly situated. (Prayer for Relief C. 2nd Amended Complaint)

Defendant moves to dismiss on grounds of mootness, claiming that the challenged operation was terminated in 1973. They rely on an affidavit of Vernon A. Walters and on the Report to the President by the Commission on CIA Activities Within the United States (hereinafter "the Rockefeller Report").

It is clear that the plaintiffs' claim for mandatory injunctive relief, at least, is very much alive, and that Defendant Kelley is the only defendant against whom such relief could be awarded. They contend that copies of their first-class mail, opened by defendants, remain in FBI files. If true, that would amount to a continuing, real and substantial controversy with Defendant Kelley. The action is therefore not moot. *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937). *See also DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). The motion to dismiss of Defendant Kelley is denied.[25]

*Interlocutory Appeal*

██ Finally, it seems apparent that the Court's resolution of the difficult jurisdictional questions before it involves a controlling question of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation. As the opinion demonstrates, various federal courts have come

24. The court in *Kipperman v. McCone,* 422 F.Supp. 860 (N.D.Cal.1976) seems to have considered the Rockefeller Report as a source of "definite evidentiary fact" for the purpose of ruling on preliminary jurisdictional motions. This court does not decide now whether or not it may consider the Rockefeller Report of the Select Committee in ruling on whether or not plaintiffs have sufficiently stated a claim against particular defendants in order to survive a Rule 12(b)(6) motion to dismiss.

25. Plaintiff also claims that injunctive relief might well be appropriate even if the mail opening program has ended. While injunctive relief is normally predicated only on a threat of

imminent irreparable harm, it has been held that in extraordinary cases egregious past harm, as to which the danger of repetition has not been removed, and which continues to have serious repercussions in the community, warrants the grant of injunctive relief. *Lankford v. Gelsten,* 364 F.2d 197, 204 (4th Cir. 1966). *See also Rizzo v. Goode,* 423 U.S. 362, 373 n. 8, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Since the Court finds the case not moot as to Defendant Kelley on other grounds, it need not consider whether the very serious acts complained of here meet the *Lankford* test.

out on different sides of nearly every issue regarding the reach of § 1391(e) faced by this Court. Furthermore, if the Court's resolution of these questions is mistaken, in all likelihood this action would be terminated in this Court. The Court therefore makes the certification required by 28 U.S.C. § 1292(b) as to the denial of the motions to dismiss of all the defendants except for Clarence Kelley and the United States.

## Class Action

■■ Plaintiffs, who seek declaratory and injunctive relief and money damages, move the Court to certify a class composed of

[a]ll United States citizens and residents whose first-class letters, written and sent by or to them, either from within or destined for the United States, were unlawfully opened, read and photographed by employees of the Central Intelligence Agency, acting in concert with employees of the United States Post Office Department, the United States Postal Service, the Federal Bureau of Investigation, the Department of Justice, and other government agencies resulting in the unlawful collection, maintenance and dissemination of files relating to them.

Defendants oppose class certification on a variety of grounds. At the threshold, they object to the conclusory terms in which the class is defined—those whose mail has been "unlawfully" opened, read, and photographed. In view of the fact that the same representation can be achieved by a class composed of "those whose mail has been opened, read, and photographed in connection with the East Coast Mail Intercept Program", the Court sustains defendants' objection; plaintiffs are directed to modify the definition of the proposed class accordingly.

■■ In addition to problems raised by defendants, the Court has its own liminal problems with the class as currently defined. It became clear at the hearing

held on this matter that beneath the surface of the broad class that plaintiffs seek to represent there exist two well-defined sub-classes. On the one hand, there are those persons whose mail was, according to the Rockefeller Report, opened, photographed or otherwise tampered with on a purely random basis. This sub-class apparently numbers in the tens of thousands. See Rockefeller Report 105. On the other hand, there is a smaller group, consisting of different individuals over the years, but averaging about three hundred persons at any one time, see Rockefeller Report 105. This sub-class is composed of persons on the so-called "watch-list", individuals of particular interest to one or more of the nation's intelligence bodies whose mail was the object of special scrutiny. See id. at 105, 111. The two groups are in markedly different positions. By definition, the watch-list sub-class had its mail surveilled for some reason, although what the reason was in each case remains to be seen. The random sub-class, on the other hand, had its mail inspected for reasons of pure chance. Whether the different positions of the two groups will have any legal significance, the Court cannot now say. It is clear, however, that there are significant practical differences between the two groups, in terms of litigating this case. For example, defendants have already indicated that they believe that they had probable cause to inspect the mail of the persons on the watch-list. Proving this claim could involve extensive discovery by defendants, involving depositions from each watch-listed class member. It could also involve the presentation of an individual defense against each such person. By contrast, the "probable cause" defense would obviously be unavailable with respect to persons whose mail was randomly opened. In view of these differences between the two groups, the Court deems it appropriate that the class be divided into two sub-classes, composed of the random group and the watch-list group respectively.[26] See Fed.R.Civ.P. 23(c)(4)(B);

---

**26.** Because the decision to create sub classes is made on the Court's own motion and only after

the hearing on class determination, the Court has not been informed whether named plain-

*Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 184–85, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (Douglas, J., dissenting in part). Rule 23(c)(4) requires the Court, once such a division has been made, to construe and apply the remaining provisions of Rule 23 accordingly. It is to that task that the Court now turns.

## A. The Requirements of Rule 23(a)

Rule 23(a) provides:

(a) *Prerequisites to a Class Action.* One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

■ As to the random sub-class, the Court has no difficulty in finding that the requirements of Rule 23(a) are satisfied. The class of persons whose mail was randomly opened numbers in the tens of thousands, *see* Rockefeller Report 105. The claims of plaintiffs (that their mail was randomly opened in violation of the fourth amendment) as well as the defense (that the mail intercept program was undertaken reasonably and in good faith) are typical class wide. The mail intercept program, as a whole, raises common questions of fourth amendment law that do not vary perceptibly according to which random class member raises these questions. Further, there is no doubt that plaintiffs' attorneys from the American Civil Liberties Union are amply qualified to carry this action forward as a class action, thus assuring "adequacy of representation" in one sense of that term, *see Cullen v. United States,* 372 F.Supp., 441, 447–48 (N.D.Ill.1974).

■ However, "adequacy of representation" also means that "the interests of the representative party must coincide with those of the class", *Mersay v. First Republic Corp.,* 43 F.R.D. 465, 469 (S.D.N.Y.1968). It has been suggested by one of the defendants that this requirement is not met in the present case because some persons whose mail was monitored might regard the East Coast Mail Intercept Project as entirely reasonable and in the national interest. This assertion, if true, is irrelevant to the question of whether this action may be maintained as a class action. *See Norwalk CORE v. Norwalk Redevelopment Agency,* 395 F.2d 920, 937 (2nd Cir. 1968). If the relief sought in this case would adversely affect tangible interests of some proposed class members it might be argued that plaintiffs were not adequate representatives of the class. *See, e. g., Dierks v. Thompson,* 414 F.2d 453, 456 (1st Cir. 1969); *Burns v. United States Postal Service,* 380 F.Supp. 623, 629 (S.D.N.Y.1974). However, such an argument cannot be based on mere speculation as to what some class members might regard as sound national policy, and the Court finds that plaintiffs provide the adequacy of representation for the interest of the proposed sub-class that is required by Rule 23(a).

■ The issues posed by the question whether the watch-list sub-class meets the requirements of Rule 23(a) are somewhat different. There is no problem as to numerosity. Although the total number of persons on the list over a twenty-year period has not been ascertained, the average number of persons on the list at any given time was about 300, *see* Rockefeller Report 106, a number in itself sufficient to render joinder impracticable. *Cf. Cullen v. United States,* 372 F.Supp. 441, 447 (joinder of 325 persons clearly impracticable). As to adequacy of representation, the Court's earlier remarks *a propos* the random sub-class apply to the watch-list sub-class with equal vigor, and the Court finds adequacy of representation as to that group.

tiffs fall into the random sub-class, the watch-list sub-class or both. This information should be furnished to the Court without delay, by stipulation or otherwise. It will be necessary

that at least one plaintiff be a member of each sub-class before an order of certification can issue. *See Sosna v. Iowa,* 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975).

The more difficult question is whether any of the named plaintiffs present claims that are typical of the class and raise issues involving common questions of law or fact. Basically, defendants contend that the legality of the surveillance of watch-listed persons depends on the particular facts of each case, as those facts shed light on the reasonableness of each intercept. Such individualized determinations, defendants argue, are the very antithesis of the typicality and common questions required by Rule 23(a). This argument does not really address plaintiffs' theory of the case.

In plaintiffs' view, a warrantless surveillance of *any* first-class mail for intelligence purposes is presumptively illegal under *any* circumstances. If this view is correct—and now is not the time to make a judgment on that point, *see Yaffe v. Powers,* 454 F.2d 1362, 1366 and n. 2 (1st Cir. 1972); *Fogel v. Wolfgang,* 47 F.R.D. 213, 215 n. 4 (S.D.N.Y. 1969)—than plaintiffs are also correct in asserting that the myriad targets of the intercept program have a unitary claim whose validity is dependent upon a single question of law. Should it become clear that plaintiffs' view of the law will not prevail the sub-class can be modified or dismissed. *See Yaffe v. Powers,* 454 F.2d at 1367. For the present, the Court finds that the requirements of typicality and commonality, as well as numerosity and adequacy of representation are present with respect to the watch-list sub-class.

### B.  *The requirements of Rule 23(b)*

■ In addition to the requirements of Rule 23(a), plaintiffs must satisfy one or more of the requirements of Rule 23(b) in order to obtain class certification. It is plaintiffs' position that the instant action may be maintained under any of the following provisions of Rule 23(b):

(b) *Class Actions Maintainable.* An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or  . . . .

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in he management of a class action.

While disputing generally that the requirements of any portion of Rule 23(b) have been met, defendants urge in particular that plaintiffs cannot properly bring this action under Rule 23(b)(2) since, in addition to injunctive relief, plaintiffs seek money damages in excess of $1 billion and Rule 23(b)(2), by its terms is applicable only to claims for "final injunctive or corresponding declaratory relief." Without disputing plaintiffs' contention that "incidental" monetary relief can be given in conjunction with injunctive or declaratory relief under Rule 23(b)(2), it seems to the Court beyond dispute that plaintiffs' attempts to impose substantial financial liability on defendants cannot fairly be characterized as "incidental." *See, e. g., Robertson v. National Basketball Association,* 389 F.Supp. 867, 900 (S.D.N.Y.1975); Advisory Committee's Notes to Rule 23, 39 F.R.D. 98, 102 (1966).

■ However, this is not to say that a claim for class-wide injunctive relief should be denied merely because it is coupled with a claim for a money judgment, however substantial. In order to preserve injunctive relief, the better course, in this Court's view, is to certify the declaratory and injunctive claims for class-wide relief under Rule 23(b)(2) if the requirements of that rule and of Rule 23(a) are met and then consider as a separate matter whether the claims for money damages can be maintained under Rule 23(b)(1) or Rule 23(b)(3). *See* 3B Moore's Federal Practice ¶ 23.45[1] at 708–09.

In the present case, it is clear that if plaintiffs prevail on the merits and satisfy the other requirements for declaratory and injunctive relief, such relief can be appropriately granted on a class-wide basis, both with respect to the watch-list sub-class and the random sub-class. As to the random sub-class, such relief, if it is to be granted to any member of the group, should be granted to all, since the very definition of the sub-class belies any individual differences among its members and defendants' decision to institute random mail surveillance was based on the common factor of the destination of the mail surveilled rather than upon any particularizing characteristics of individual addresses.

As to the watch-list sub-class, defendants claim to have acted on the basis that surveillance of persons in that group was reasonably justified. Should that assumption prove erroneous *in toto*, class-wide relief will be appropriate. Should the assumption be upheld in its entirety, defendants will be entitled to a judgment in their favor running against the sub-class as a whole. If the validity of defendants' "reasonableness" standard must be tested on a case-by-case basis, the sub-class can be dismissed as improvidently certified. *See, e. g. City of Philadelphia v. Emhart Corp.*, 50 F.R.D.

232, 235 (E.D.Pa.1970). At this juncture, the common thread of "reasonableness," generally applicable to the entire sub-class, is sufficient to permit certification of the watch-list sub-class under Rule 23(b)(2) for purposes of seeking declaratory and injunctive relief.[27]

■ It remains to be determined whether plaintiffs' claims for money damages are amenable to class treatment. More precisely, the Court must consider whether plaintiffs can maintain a class action on the issue of liability for money damages, for the Court rejects at the outset plaintiffs' contention that the actual assessment of damages to individual class members can be tried on a class-wide basis. As defendants accurately point out, the gravamen of plaintiffs' damages claim is that the privacy of persons whose mail was monitored has been violated. How much compensation, if any, such persons are entitled to is necessarily a matter that the jury must assess on a case by case basis, assessing the harm done in each case. Plaintiffs' suggestion that a dollar amount can be arbitrarily assigned as compensation for each letter opened or photographed cannot be accepted. *Dellums v. Powell*, No. 1022–71 (D.D.C.), *appeal pending*, a case cited by plaintiffs in which class-wide damages for constitutional violations were awarded, did not involve the uniquely subjective claims of privacy that are implicated when, as here, a fourth amendment violation is claimed.

In deciding the question of whether a class action on the issue of liability can be maintained by either of the sub-classes, a threshold problem arises that is not present if the claims for relief were limited to declaratory and injunctive relief.

The problem, although identified by defendants as related to the question of whether plaintiffs' claims are typical of those of the class sought to be represented,

---

**27.** Defendants have argued that appropriate injunctive relief may be framed in this case without certifying a class. *See, e. g., District of Columbia Podiatry Society v. District of Columbia*, 65 F.R.D. 113 (D.D.C.1974). This Court, however, will follow what it regards as the better rule, that, at least in civil rights cases, certification for purposes of injunctive relief is appropriate wherever the requirements of Rule 23 have been met. *See, e. g., Fujishima v. Board of Education*, 460 F.2d 1355, 1360 (7th Cir. 1972).

might also be described as one of standing. To the extent that plaintiffs seek class-wide declaratory and injunctive relief, there can be little doubt as to their standing. Plaintiffs allege that they and all other class members have been the victims of a government program that has violated their constitutional and statutory rights and seek a declaration that the program was illegal, an injunction against its continuance, and a mandatory order that the files kept as a result of the program be destroyed. Insofar as this relief can be obtained from the present governmental officials who are parties to this suit, it is clear that plaintiffs have standing to seek this relief on behalf of the class. The harm that the named plaintiffs allege is the same as that of the two sub-classes generally: it is the threatened continuation of the program and the continued existence in government files of the information gleaned by the program.

The claims on liability for money damages stand on a somewhat different footing.[28] Plaintiffs seek money damages on behalf of the class from each of the officials responsible for the mail intercept program throughout the twenty year period of its existence even though their own individual mail was only allegedly tampered with during a part of that period. The question is thus raised as to how plaintiff Driver, for example, whose mail was allegedly opened in 1965 and 1969, can have standing to seek damages from defendant Schlesinger, for example, whose involvement in the intercept program, by plaintiffs' own allegations, did not begin until after 1970; or against defendant Bissell, whose tenure with the CIA extended from 1959 only until 1962. Courts have resolved this question in various ways, some holding that class representation is not possible under such circumstances, see, e. g., Weiner v. Bank of King of Prussia, 358 F.Supp. 684 (E.D.Pa.1973); see also La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir.

1973) (lack of typicality). On the other hand, at least one court has held that a class action is maintainable even where plaintiffs would be unable in their own right to bring an action against all of the defendants. Haas v. Pittsburgh National Bank, 60 F.R.D. 604, 611–614 (W.D.Pa. 1973).

This Court need not attempt to resolve these conflicting positions, since it appears that the rule that one or more of the named plaintiffs must individually have a cause of action against each named defendant in order for a class action to be maintained does not apply to "situations in which all injuries are the result of a conspiracy" or to "instances in which all defendants are juridically related in a manner that suggests a single resolution of the dispute would be expeditious." La Mar, 489 F.2d at 466.

■ In the Court's opinion, plaintiffs' complaint fits both branches of the La Mar exception. Plaintiffs' complaint alleges a massive and concerted program of covert mail intercepts over a twenty-year period, the maintenance of on-going files based on information gleaned from the intercepts, and a conspiracy to conceal the existence of the entire operation. The officials and former officials named are, moreover, juridically related in that they are all past and present federal officials whose duties included oversight either of foreign or domestic intelligence gathering or the proper delivery of the U. S. Mail. These considerations fit the present complaint easily within the La Mar exception. See also Washington v. Lee, 263 F.Supp. 327, 330–31 (M.D.Ala.1966) (plaintiffs segregated by race in one county jail can represent class of similarly situated persons in all county jails throughout state). Accordingly, the Court holds that named plaintiffs who are members of the two sub-classes have standing to raise the claims of the members of their respective sub-class against former of-

---

28. It is not clear from plaintiffs' complaint whether they seek an injunction against former CIA, FBI, and post office personnel or a declaration that these former officials' conduct was illegal. If such relief is indeed sought, it raises the same standing problems as does the claim for monetary relief and the Court's discussion of that point applies equally to claims for declaratory and injunctive relief against former officials.

ficials whose tenure does not correspond to the dates of the individual mail openings alleged by any of the named plaintiffs.

The Court now turns to the question of whether a class-wide claim that defendants' conduct has rendered them liable in damages fits either of the two remaining sections of Rule 23(b) suggested by plaintiffs.

It seems clear that Rule 23(b)(1)(A) cannot apply to the liability claim. Assuming that Rule 23(b)(1)(A) is applicable to claims for damages, a question not free from doubt, *see, e. g., Kristiansen v. John Mullens & Sons, Inc.*, 59 F.R.D. 99, 105 and n. 6 (E.D.N.Y.1973); *Ratner v. Chemical Bank New York Trust Co.*, 54 F.R.D. 412, 415 and n. 5 (S.D.N.Y.1972); *but see Berman v. Narragansett Racing Association*, 48 F.R.D. 333, 337 (D.R.I.1969) (by implication) the rule is inapposite to the present facts. The plaintiffs argue that Rule 23(b)(1)(A) certification is necessary to establish compatible "standards of conduct for the party opposing the class." However, the Court's decision to certify the sub-classes under Rule 23(b)(2) for class-wide injunctive relief has accomplished this for it will necessarily mean that a class-wide adjudication will be forthcoming (unless the class is de-certified) that will establish a standard of conduct to be observed by defendants in the future and will preclude any need for the establishment of such a standard by means of a damages action under Rule 23(b)(1)(A).

There remains Rule 23(b)(3). In order for plaintiffs to maintain a class action on the issue of liability on behalf of either subclass, the Court must find that common questions of law and fact predominate over individual questions and that "a class action is superior to other available methods for the fair adjudication of the controversy." Rule 23(b)(3).

Insofar as plaintiffs seek a class-wide adjudication of defendants' liability on behalf of the random sub-class, there is little doubt that such treatment is warranted. The Court has already determined to make a class-wide adjudication of the legality of the intercept program under Rule 23(b)(2). Adjudication of the issue of liability will add only the element of any good faith or other defense that defendants choose to raise. Since the random sub-class members are completely fungible, having been selected by chance and the accident that they all corresponded with persons in the Soviet Union, it cannot be said that the validity of any defenses raised will vary from individual to individual, or that any individual class member will have any special interest in controlling his or her individual litigation. Judicial economy, the prevention of multiple lawsuits, the absence of any substantial difficulty in concentrating this litigation in this forum—all of these factors lend additional support to the Court's conclusion that defendants' liability to the random sub-class should be adjudicated as a class action.

Application of the Rule 23(b)(3) criteria to the watch-list sub-class leads to a quite different conclusion. Defendants have made it clear that they plan to defend against liability for the mail surveillance of watch-listed persons on the grounds that they reasonably believed that each such surveillance was proper. When the Court considers the extensive pre-trial discovery and trial testimony that such a defense will entail, it must conclude that the question of the manageability of such a class action raised by defendants is no mere spectre, and poses serious problems that render class action certification of the watch-list sub-class on the question of defendants' liability inappropriate at this time.[29]

---

**29.** Two reasons dictate a different result concerning certification under Rule 23(b)(3) of a class action on behalf of the watch-list subclass with respect to the issue of liability than was reached with respect to certification under Rule 23(b)(2) for the claims for declaratory and injunctive relief. First, the "good-faith" defense, with its concomitant problems is obviously not available insofar as the relief sought is declaratory and injunctive. Second, and controlling, "the existence of 'predominating' questions and the availability of other methods of resolution which might be superior to a class action are not criteria of a subdivision (b)(2) class, but . . . of a (b)(3) class . . . ." *Yaffe v. Powers*, 454 F.2d 1362, 1366 (1st Cir. 1972).

## C. Notice

Because the liability issue in this case will proceed as a Rule 23(b)(3) class action on behalf of the sub-class of persons whose mail was randomly photographed, opened, or inspected in connection with the East Coast Mail Intercept Program, notice to members of the sub-class is required by Rule 23(c)(2). This notice must include individual notice to sub-class members if the addresses of the individuals are available through reasonable effort. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Whether the addresses are available in the present case can only be determined after discovery proceedings, and the Court will enter an appropriate order regarding notice at that time. It should be noted that whatever notice is ordered must be at plaintiffs' expense. *Id.* at 178–179, 94 S.Ct. 2140. Plaintiffs' contention that the government should bear the cost of notice in this case cannot be sustained under *Eisen*. While the *Eisen* Court left open the possibility that defendants may be made to bear the cost of notice where there exists a fiduciary relationship between plaintiff and defendants, plaintiffs have not established that such a relationship exists between plaintiffs and defendants in the present case.

One final comment is in order. Defendants, citing *Berlin Democratic Club v. Rumsfeld*, 410 F.Supp. 144 (D.D.C.1976), argue that maintenance of a class action in this case will lead to endless procedural battles over discovery and impermissible inquiries into the nature and scope of intelligence activity. The latter objection, whatever its validity in other cases, is inapplicable to the present case, where the East Coast Mail Intercept Program is already a matter of detailed public knowledge due to the publication of the Rockefeller Report and the Report of the Select Committee. The existence of those reports should also preclude many objections to discovery that might otherwise be made. In any case, plaintiffs here have raised a class-wide claim for injunctive and declaratory relief that they seek to certify under Rule 23(b)(2) as well as claims for class-wide damages under Rule 23(b)(3). While considerations of undue publicity might conceivably have some bearing on the determination the Court must make under Rule 23(b)(3) as to whether a class action is superior to other modes of adjudication, no such determination is authorized under Rule 23(b)(2). Since the same information will undoubtedly be sought in discovery whether the relief sought is injunctive and declaratory only or is coupled with claims for money damages, defendants' objections on grounds of undue publicity must be rejected.

To summarize, the Court finds that plaintiffs' proposed class of all United States citizens whose mail was unlawfully opened, read, and photographed must be amended to avoid the conclusory term "unlawfully," that the class must be divided into sub-classes composed of those persons whose mail was opened, read, and photographed randomly and those persons whose mail was opened, read, and photographed based on their presence on the watch-list, that at least one named plaintiff must be a member of each sub-class, that a class action may be certified as to both sub-classes under Rule 23(b)(2) for purposes of adjudicating the claims for injunctive and declaratory relief, that a class action on behalf of the random sub-class may be certified under Rule 23(b)(3) for purposes of adjudicating the claim that defendants are liable in damages to the members of that sub-class, that class certification of the liability claims of the watch-list sub-class is inappropriate at this time, and that individual notice of the class action on the issue of liability must be sent at plaintiffs' expense to all members of the random sub-class whose addresses are obtainable through reasonable effort.

Counsel will prepare an order in accordance with this opinion.