643 F.2d 1229
 1981-1 Trade Cases 63,886
 CHRYSLER CORPORATION, Plaintiff-Appellant,
v.
FEDDERS CORPORATION, Fedders International Corporation,
Airtemp Corporation, Airtemp International
Corporation, Fedders World Trade
Corporation and Interclisa,
S.A., Defendants-Appellees.
 No. 78-1287.
 United States Court of Appeals,
Sixth Circuit.
 Argued April 11, 1980.
Decided and Filed March 18, 1981.
Rehearing and Rehearing En Banc Denied May6, 1981.
 
 William G. Christopher, Avern Cohn, Honigman, Miller, Schwartz & Cohn, Detroit, Mich., Robert Ehrenbard, Kelley, Drye & Warren, William C. Heck, New York City, for plaintiff-appellant.
 Gilbert E. Gove, Miller, Canfiled, Paddock & Stone, Detroit, Mich., for Fedders.
 John H. Fildew, Fildew, Bilbride, Miller & Todd, Charles D. Todd, III, Detroit, Mich., for Interclisa.
 Lawrence N. Weiss, Weisman, Celler, Spett, Modlin & Wertheimer, Russell E. Brooks, Richard C. Tufaro, Milbank, Tweed, Hadley & McCloy, New York City, for defendants-appellees.
 Before EDWARDS, Chief Judge, BOYCE F. MARTIN, Jr., Circuit Judge, and PHILLIPS, Senior Circuit Judge.
 BOYCE F. MARTIN, Circuit Judge.
 
 
 1
 Chrysler Corporation appeals the dismissal of its complaint charging Fedders Corporation and others with violations of the antitrust laws. The case arose after Chrysler entered into an agreement with Fedders to sell virtually all the assets of Chrysler's Airtemp Division. The Airtemp Division was engaged in the business of designing, manufacturing, marketing, and servicing non-automotive air-conditioning systems. The assets acquired by Fedders included the stock of various subsidiaries connected with the Airtemp operation, but excluded two subsidiaries in Australia and South Africa. Chrysler also covenanted, with certain exceptions, not to compete in the non-automotive air-conditioning market for a period of five years.
 
 
 2
 After the contract was executed, Chrysler became dissatisfied with the agreement. According to the complaint filed below, Fedders has never paid Chrysler several million dollars due under the contract.
 
 
 3
 On November 14, 1977, Chrysler brought this action under § 4 of the Clayton Act, 15 U.S.C. § 15, alleging that the defendants had violated § 1 of the Sherman Act, 15 U.S.C. § 1. The complaint charged the defendants with conspiring to manipulate the non-automotive air-conditioning market in a manner calculated to lessen and eliminate competition. In addition to the antitrust claim, Chrysler alleged twenty-two pendant claims for relief under state law.
 
 
 4
 On February 10, 1978, all the defendants except Interclisa moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the antitrust claim on the grounds that it failed to state a cause of action and that Chrysler lacked standing to sue under § 4 of the Clayton Act. They also moved under Rule 12(b)(1) to dismiss the other claims for lack of diversity.
 
 
 5
 On February 24, 1978, the District Court granted the motion to dismiss the antitrust claim. It specifically found that Chrysler met the standing requirements articulated by this Court in Malamud v. Sinclair Oil Corp., 521 F.2d 1142 (6th Cir. 1975), but went on to hold that Malamud is "wrong" in light of the Supreme Court's decision in Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). The District Court characterized Chrysler's claim as a breach of contract action which lacked the element of "antitrust injury" required by Brunswick. Because this essential element was missing, the court held that Chrysler did not have standing to sue under § 4 of the Clayton Act.
 
 
 6
 On March 10, 1978, defendant Interclisa, a Spanish corporation, filed a Rule 12(b)(2) and 12(b)(6) motion to dismiss the complaint against it. Interclisa alleged, in addition to the arguments advanced by the Fedders defendants, that the court lacked in personam jurisdiction over Interclisa. The District Court agreed and granted the motion, holding that Interclisa had insufficient contacts with the forum to support jurisdiction under either the Michigan long arm statute, M.C.L.A. § 600.715(2), or § 12 of the Clayton Act, 15 U.S.C. § 22. The court also denied Chrysler's request for further discovery on the question of Interclisa's forum contacts.
 
 
 7
 On appeal, Chrysler contends that it succeeded in making out a cause of action under § 1 of the Sherman Act and that it satisfies this circuit's requirements for standing to sue under § 4 of the Clayton Act. It argues that our opinion in Malamud is unaffected by the Supreme Court's Brunswick decision and that, in any event, its complaint alleges "antitrust injury." Chrysler also claims that the District Court erred in dismissing the complaint against Interclisa on jurisdictional grounds and in refusing to allow Chrysler to conduct further discovery of jurisdictional facts.
 
 
 8
 We hold that Brunswick does not negate our decision in Malamud. Rather, the effect is cumulative; Brunswick merely adds to the standing requirements set out in Malamud. Insofar as Chrysler claims that the defendants eliminated it as a competitor in the non-automotive air-conditioning market, the District Court correctly concluded that Chrysler failed to allege "antitrust injury" and therefore lacked standing under § 4 of the Clayton Act. However, certain of Chrysler's other allegations do satisfy this circuit's post-Brunswick standing test and should not have been dismissed.
 
 
 9
 Finally, we affirm the District Court's finding that it lacked personal jurisdiction over Interclisa and uphold its exercise of discretion in denying Chrysler's request for further discovery.
 
 
 10
 I. Chrysler's Standing Under § 4 of the Clayton Act
 
 
 11
 In Malamud, supra, this Court addressed the troublesome question of standing to sue under § 4 of the Clayton Act. The plaintiffs in that case fell into three categories: 1) the individuals Jack and Ann Malamud, who were also the officers, directors, and sole shareholders of the corporate plaintiffs; 2) Malco Petroleum, a petroleum distributing corporation; and 3) three real estate investment corporations.
 
 
 12
 In 1965, Malco and Sinclair Oil executed a distribution agreement. The parties had an understanding that Sinclair would provide financial assistance to the Malamuds' investment companies in their efforts to acquire and develop new service station properties. In early 1966, however, Sinclair declined to help finance several proposed real estate ventures, whereupon Malco unsuccessfully sought an early termination of the contract. After the contract expired, the plaintiffs filed suit, alleging that Sinclair's failure to provide financing and refusal to permit an early contract termination violated § 1 of the Sherman Act and § 3 of the Clayton Act.
 
 
 13
 Sinclair sought and was denied summary judgment. On a motion for reconsideration, it argued that all of the plaintiffs lacked standing because none of them had been "directly" injured. The District Court rejected this contention and held that all the plaintiffs had standing as defined in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). However, it went on to find that neither the individual plaintiffs nor Malco could possibly satisfy the further requirement that their injury bear a "direct" and causal relationship to the alleged antitrust violations. As for the investment company plaintiffs, however, a determination of the "directness" of their injury presented mixed questions of law and fact. Accordingly, the District Court denied summary judgment against the investment firms. It subsequently certified for appeal the threshold question of their standing to sue.
 
 
 14
 We affirmed the lower court's finding that the investment companies had standing but rejected its application of the "direct injury" test as a means of limiting standing under § 4. 521 F.2d at 1149. The concept of "direct injury," derived from Loeb v. Eastman Kodak, 183 F. 704 (3rd Cir. 1910), focuses on the relationship between the plaintiff and the defendant. If the alleged injury is "remote," such as that of a stockholder or creditor of a corporation injured by the defendant, standing is denied. Loeb, supra; Gerli v. Silk Association of America, 36 F.2d 959, 960 (S.D.N.Y.1919). We also rejected the "target area" test, another means of circumscribing standing under § 4. That standard requires the plaintiff to be within the area of the economy allegedly injured by the defendant, In Re Multidistrict Vehicle Air Pollution M.D.L. No. 31, 481 F.2d 122 (9th Cir.), cert. denied, 414 U.S. 1045, 94 S.Ct. 551, 38 L.Ed.2d 336 (1973); In Re Beef Industry Antitrust Litigation, 600 F.2d 1148 (5th Cir. 1979), and has spawned numerous and often inconsistent opinions attempting to delineate its scope. See Berger and Bernstein, An Analystical Framework for Antitrust Standing, 86 Yale L.J. 809, 830 (1977).
 
 
 15
 The two approaches to standing described above purport to derive from the causative language in § 4 itself, i. e., absent a showing that the plaintiff suffered "direct injury" or was within the "target area," no injury "by reason of anything forbidden in the antitrust laws" is deemed to have occurred. Our refusal to apply either theory was based on the belief that both demand too much from a plaintiff at the pleading stage of his case. In effect, they require a court "to make a determination on the merits of a claim under the guise of assessing the standing of the claimant." 521 F.2d at 1150. (emphasis in original).
 
 
 16
 We decided in Malamud that the appropriate test for standing in an antitrust action is the one articulated by the Supreme Court in Association of Data Processing Service Organizations v. Camp, supra, a case involving standing under the Bank Service Corporation Act of 1962, 12 U.S.C. § 1864. That standard requires (1) an allegation that the defendant caused the plaintiff injury in fact, and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the relevant antitrust laws. 521 F.2d at 1151. In essence, we repudiated any "proximate cause" limitations on antitrust standing in favor of the less stringent requirement that the plaintiff be protected by the substantive antitrust law. See Berger and Bernstein, supra, at 838-39.
 
 
 17
 Two years after Malamud, the Supreme Court decided the Brunswick case. There, the plaintiffs sought treble damages against the Brunswick Corporation, one of the two largest manufacturers of bowling equipment in the United States. During the retail bowling boom in the 1950's, the majority of Brunswick's sales were on extended credit terms. The early 1960's brought a sharp decline in the industry, and Brunswick encountered great difficulty in collecting the debts created by the earlier expansion. Brunswick began repossessing the equipment and, where possible, reselling it in place to third parties. Where resale was impossible, Brunswick acquired and operated certain defaulting retail centers. The plaintiffs were retail bowling centers in competition with the acquired centers in three markets. They alleged that Brunswick's acquisitions in those markets violated § 7 under the "deep pocket" theory of Reynolds Metals Co. v. F. T. C., 309 F.2d 223 (D.C.Cir.1962), and F. T. C. v. Proctor and Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967). The plaintiffs argued that but for Brunswick's acquisitions the acquired centers would have gone out of business, and the plaintiffs would have gained customers and realized increased profits. Thus, they concluded, they were injured in their business by reason of Brunswick's § 7 violation and were, therefore, entitled to treble damages under § 4.
 
 
 18
 The Supreme Court rejected this theory of recovery, holding that § 4 requires a plaintiff to prove more than just a § 7 violation and a causal link between that violation and the alleged injury. 429 U.S. at 489, 97 S.Ct. at 697. The Court noted that the plaintiffs' real complaint was that Brunswick's acquisition of the bowling centers preserved competition, thereby depriving the plaintiffs of the increased profits which would have resulted from the reduction of competition. The Court stated:
 
 
 19
 Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be "the type of loss that the claimed violations ... would be likely to cause." Zenith Radio Corp. v. Hazeltine Research, 395 U.S. at 125, 89 S.Ct. at 1577.
 
 
 20
 Id. (footnote omitted). Since the plaintiffs offered no alternative theory to support their damage award, the Court directed that a judgment notwithstanding the verdict be entered in favor of Brunswick. Id. at 490, 97 S.Ct. at 698.
 
 
 21
 We disagree with Chrysler's suggestion that the holding in Brunswick is limited to treble damage actions for violations of § 7 of the Clayton Act. Although that decision was an "intermeshing" of § 7's prohibitions with the § 4 remedy, 429 U.S. at 486, 97 S.Ct. at 696, it primarily addresses the boundaries of the treble damage section. The Supreme Court was concerned with bringing antitrust recovery in line with the purposes of the antitrust laws. Id. at 487, 97 S.Ct. at 696. We see no reason why its holding should not be applicable where, as here, the statutory prohibition upon which a treble damage action is based is found in the Sherman Act.
 
 
 22
 We also disagree with Chrysler's assertion that nothing in Brunswick mandates any change in the Malamud standing tests. Although the Supreme Court did not explicitly describe the issue in Brunswick as one of standing, that decision clearly establishes that a plaintiff must plead an injury of the type § 4 was intended to remedy before his case will be heard. That Brunswick involved a controversy which had already been tried in the District Court does not, as Chrysler argues, limit its relevance to the causation of antitrust damage. If the failure to prove cognizable damages requires a judgment for the defendant notwithstanding the verdict, 429 U.S. at 491, 97 S.Ct. at 698, it follows that a failure to allege cognizable damages compels the dismissal of the complaint.
 
 
 23
 Thus, we interpret Brunswick to mean that the pleading of "antitrust injury" is an essential component of standing under § 4 of the Clayton Act.[1] Other courts have reached a similar conclusion. John Lenore & Co. v. Olympia Brewing Co., 550 F.2d 495 (9th Cir. 1977); Hardwick v. Nu-Way Oil Co., 443 F.Supp. 940 (S.D.Tex.1978); aff'd, 589 F.2d 806, cert. denied, 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979); Juneau Square Corp. v. First Wisconsin National Bank, 445 F.Supp. 965 (E.D.Wis.1978); L&H Investments, Ltd. v. Belvey Corp., 444 F.Supp. 1321 (W.D.N.C.1978).
 
 
 24
 As we have already observed, Brunswick merely adds to the Malamud standing requirements; it does not, as the District Court suggests, prove Malamud "wrong." Brunswick in no way alters our rejection of the "direct injury" and "target area" approaches to antitrust standing. Indeed, we reiterate here our admonition against making a determination on the merits under the guise of assessing the standing of the claimant. "The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." Flast v. Cohen, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968).
 
 
 25
 In order to establish standing in an antitrust action, this circuit continues to require (1) that the plaintiff allege injury in fact and (2) that the interest which the plaintiff seeks to protect is arguably within the zone of interests protected by the statute in question. Brunswick adds to that standard the requirement that the plaintiff allege antitrust injury when seeking treble damages under § 4 of the Clayton Act. Unlike the "direct injury" and "target area" tests, Brunswick does not inject an element of proximate cause into the standing inquiry; rather, it compels the court to focus on the type of injury pleaded and its relationship to the alleged anticompetitive conduct.
 
 
 26
 In the present case, Chrysler's primary allegation is that it has been eliminated from competition with the defendants by the virtual destruction of the Airtemp Division and its affiliated foreign subsidiaries. Chrysler contends that Fedders' failure to fulfill its obligations under the contract gave the Fedders defendants the financial power to effect this destruction. Chrysler does not suggest that the contract itself violates the antitrust laws; rather, it claims that Fedders' subversion of that agreement was the anticompetitive means of eliminating Chrysler from the market.
 
 
 27
 We hold that these alleged injuries do not constitute "anti-trust injury" within the meaning of Brunswick, supra. By contracting to sell virtually all the assets of the Airtemp Division and all but two of its foreign subsidiaries, Chrysler voluntarily withdrew from competition in the non-automotive air-conditioning market. It did not contemplate continuing to compete in that market and in fact covenanted not to do so except through the Australian and South African subsidiaries.
 
 
 28
 Even if a breakdown of competitive conditions in the market has indeed occurred, Chrysler's loss is not attributable to that change. Chrysler would have suffered an identical loss if the defendants had failed to make payments under the contract for reasons unrelated to the alleged antitrust violations. Cf. Brunswick, supra, at 487, 97 S.Ct. at 696. Moreover, if the defendants had fulfilled their obligations as agreed, Chrysler would have no complaint, yet would still be divested of its assets and precluded from competing in the market. See A. D. M. Corp. v. Sigma Instruments, Inc., 628 F.2d 753 (1st Cir. 1980). Therefore, to the extent that Chrysler alleges damages resulting from its elimination from competition with the defendants through the Airtemp Division and the subsidiaries included in the contract for sale, it lacks the "essential connection between injury and the aims of the antitrust laws" necessary to establish standing. A. D. M. Corp., supra, at 754.
 
 
 29
 However, Chrysler does not lack standing to pursue all of the allegations in its complaint. The claim that it has been injured as a purchaser of air-conditioning equipment by the defendants' anticompetitive acts is clearly an allegation of "antitrust injury." See Chattanooga Foundry & Pipe Works v. Atlanta, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906). Chrysler also satisfies both requirements of the standing test set out in Malamud. That claim cannot be dismissed on the pleadings; on remand, Chrysler must be given an opportunity to support its allegation with proof.
 
 
 30
 Chrysler's contention that it has been injured by the destruction of Chrysler South African and Chrysler Australia, the two subsidiaries excluded from the agreement, is also an allegation of "antitrust injury." As a shareholder of those subsidiaries, Chrysler has pleaded injury which reflects the anticompetitive nature of the challenged conduct. This claim satisfies Malamud 's requirements as well; it alleges injury in fact, and Chrysler's interest as the parent of a subsidiary destroyed by a § 1 violation is arguably within the zone of interests protected by the antitrust laws. The real question regarding this alleged injury is not one of standing, but of directness. When we rejected the "direct injury" approach to standing in Malamud, we explicitly characterized the issue of "directness" as "one that must be resolved upon some factual showing." 521 F.2d at 1150. Though the District Court may conclude that Chrysler is too remote from the violation to maintain an action for these damages, see Volasco Products Co. v. Lloyd A. Fry Roofing Co., 308 F.2d 383 (6th Cir. 1962), cert. denied, 372 U.S. 907, 83 S.Ct. 721, 9 L.Ed.2d 717 (1963), it may not dismiss the claim on the theory that Chrysler lacks standing to assert it. Such a result would contravene the liberal standing requirements adopted by this circuit in Malamud.
 
 II. Jurisdiction Over Interclisa
 
 31
 Chrysler asserts that the District Court had personal jurisdiction over Interclisa under the Michigan long arm statute, M.C.L.A. § 600.715(2), and under § 12 of the Clayton Act, 15 U.S.C. § 22.
 
 
 32
 A. Jurisdiction under the long arm statute.
 
 
 33
 The Michigan long arm statute, available to Chrysler pursuant to Rule 4(e) of the Federal Rules of Civil Procedure, provides for limited in personam jurisdiction over a corporation whose relationship with the state arises from "(t)he doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort." Chrysler's antitrust claim is a form of tort action. See Weinstein v. Norman M. Morris Corp., 432 F.Supp. 337 (E.D.Mich.1977).
 
 
 34
 The Michigan statute confers on the state courts the maximum scope of personal jurisdiction permitted by the due process clause of the Fourteenth Amendment. Microelectronic Systems Corp. v. Bamberger's, 434 F.Supp. 168 (E.D.Mich.1977). Due process requires that defendants have such minimum contracts with the forum state that maintenance of an action would not offend "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
 
 
 35
 The only contacts which Chrysler asserts that Interclisa has had with the State of Michigan are the acts of Interclisa's codefendants. Chrysler alleges that Interclisa conspired to violate the antitrust laws and that "critical acts" in furtherance of the conspiracy were performed in Michigan by Interclisa's coconspirators. Chrysler claims that those acts and their consequences are attributable to Interclisa for the purpose of establishing the minimum contacts necessary to the court's exercise of personal jurisdiction.
 
 
 36
 This court has not addressed the question of whether the acts of a coconspirator, performed in the forum state in furtherance of the conspiracy, constitute sufficient minimum contacts to establish personal jurisdiction over an absent coconspirator who has no other contact with the forum. The leading case on this "conspiracy theory" of jurisdiction is Leasco Data Processing Equipment Corp. v. Maxwell, 319 F.Supp. 1256 (S.D.N.Y.1970), a securities fraud action under the Securities Exchange Act of 1934. There, one of the defendants, an English solicitor, challenged the District Court's jurisdiction over him under the New York long arm statute. He argued that allegations of his participation in a conspiracy which acted in New York through another defendant were, without more, insufficient to support jurisdiction. In holding that it did not have personal jurisdiction over the alien defendant,[2] the court stated that "mere allegations of conspiracy and even the presence of one co-conspirator within the jurisdiction do not give jurisdiction over all the alleged coconspirators." 319 F.Supp. at 1261. It added that the plaintiff's allegations of conspiracy were totally unsupported and were denied by the alien defendant by affidavit. The court noted that "(t)o meet due process requirements there must be a factual showing of conspiracy and also of a connection between the acts of the conspirator who was present in the jurisdiction and the conspirator who was absent." Id.
 
 
 37
 The Leasco approach has been adopted in several jurisdictions where the question has arisen. See, e. g., McLaughlin v. Copeland, 435 F.Supp. 513 (D.Md.1977); Chromium Industries v. Mirror Polishing and Plating Co., 448 F.Supp. 544 (N.D.Ill.1978). Other courts have rejected the coconspirator theory as an impermissible means of enlarging the "transacting business" test of § 12 of the Clayton Act. See Weinstein v. Norman M. Morris Corp., supra; West Virginia v. Morton International, Inc., 264 F.Supp. 689 (D.Minn.1967); I. S. Joseph Co., Inc. v. Mannesmann Pipe and Steel Corp., 408 F.Supp. 1023 (D.Minn.1976).
 
 
 38
 The Leasco requirement that a plaintiff make a factual showing of conspiracy has been criticized because of the difficulties of pleading and proving conspiracy. Thus, in Mandelkorn v. Patrick, 359 F.Supp. 692 (D.D.C.1973), the court exercised personal jurisdiction over the non-resident defendants as a result of their alleged participation in a conspiracy to violate 42 U.S.C. §§ 1983 and 1985, despite the plaintiffs' failure to make a factual showing of conspiracy. However, the Mandelkorn court found it significant that the defendants had denied neither the existence of nor their participation in the alleged conspiracy. It specifically noted that the situation would have been quite different if the defendants had denied the allegations. 359 F.Supp. at 396-97. See also Centronics Data Computer Corp. v. Mannesmann, A.G., 432 F.Supp. 659 (D.N.H.1977).
 
 
 39
 In the present case, Chrysler's allegation of a conspiracy including Interclisa and the Fedders defendants is unsupported by any factual assertions. In support of its motion to dismiss, Interclisa filed two affidavits of its managing director, Alfredo Calzada Atienza. Those affidavits state, in pertinent part, that Interclisa was not involved in the contract negotiations between Chrysler and Fedders and had no knowledge of or connection with any conspiracy. Chrysler did not submit counter-affidavits and, as the trial court pointed out, offered no reason to doubt any of the statements in Mr. Calzada's affidavits. Under these circumstances we hold that Chrysler's totally unsupported allegations of conspiracy cannot constitute sufficient contacts with Michigan to justify an exercise of personal jurisdiction over Interclisa by the District Court.
 
 
 40
 Similarly, the allegation of conspiratorial activities with tortious consequences in the forum state is insufficient to support jurisdiction under the long arm statute in the absence of some minimal factual showing of Interclisa's participation in the conspiracy. Cf. Weinstein, supra, 432 F.Supp. at 345.
 
 
 41
 In light of our holding on this issue, we need neither adopt nor reject the "conspiracy theory" of in personam jurisdiction as a general principle of law in this circuit.
 
 
 42
 B. Jurisdiction under § 12 of the Clayton Act.
 
 
 43
 Chrysler advances a second basis for its assertion that Interclisa is subject to the personal jurisdiction of the District Court. According to Chrysler's theory, jurisdiction over a foreign corporation being sued on a federal cause of action may be founded on the corporation's contacts with the United States as a whole as opposed to its contacts with the forum state.[3] This "national contacts" or "aggregate contacts" concept is based on the proposition that a court's jurisdictional power to render a binding judgment on federal questions must be examined in light of the due process clause of the Fifth rather than the Fourteenth Amendment. Edward J. Moriarty & Co. v. General Tire and Rubber Co., 289 F.Supp. 381 (S.D.Ohio 1967). Although the "minimum contacts" test developed in the International Shoe line of cases deals with Fourteenth Amendment due process restrictions on the states, the rationale of those cases applies equally to the Fifth Amendment, since the sovereign powers of the United States are at least as broad as those of the states. Amburn v. Harold Forster Industries, Ltd., 423 F.Supp. 1302, 1304 (E.D.Mich.1976). The court in Moriarty, supra, described the appropriate application of the minimum contacts test to state and federal governments:
 
 
 44
 Thus, in our view, the judicial jurisdiction over the person of the defendant does not relate to the geographical power of the particular court which is hearing the controversy, but to the power of the unit of government of which that court is a part. The limitations of the concept of personal jurisdiction are a consequence of territorial limitations on the power of the respective forums. Thus, as applied to the states, the constitutional test for personal jurisdiction involves a determination as to whether the defendant has certain minimal contacts with the forum state, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).
 
 
 45
 By the same token, we feel that the appropriate inquiry to be made in a federal court where the suit is based upon a federally created right is whether the defendant has certain minimal contacts with the United States, so as to satisfy due process requirements under the Fifth Amendment. For a thorough discussion of this theory, see Green, "Federal Jurisdiction in Personam of Corporations and Due Process," 14 Vanderbilt L.Rev. 967 (1961); Note, "Jurisdiction of Federal District Courts over Foreign Corporations," 69 Harv.L.Rev. 508 (1956). Also see, Jaftex Corp. v. Randolph Mills, Inc., 282 F.2d 508 (2 Cir. 1960); Gkiafis v. Steamship Yiosonas, 342 F.2d 546 (4 Cir. 1965); Mutual International Export Co. v. Napco Industries, Inc., 114 U.S.App.D.C. 392, 316 F.2d 393 (1963); Lone Star Package Car Co. v. Baltimore & O. R. Co., 212 F.2d 147 (5 Cir. 1954); Goldberg v. Mutual Readers League, Inc., 195 F.Supp. 778 (E.D.Pa.1961); Bar's Leaks Western v. Pollock, 148 F.Supp. 710 (N.D.Cal.1957); Singleton v. Atlantic Coast Line R. R. Co., 20 F.R.D. 15 (E.D.Mich.1956).
 
 
 46
 It may well be neither unfair nor unreasonable as a matter of due process to aggregate the nonforum contacts of an alien corporate defendant in order to establish personal jurisdiction. In Engineered Sports Products v. Brunswick Corp., 362 F.Supp. 722 (D.Utah 1973), the court observed: "Due Process or traditional notions of fair play and substantial justice should not immunize an alien defendant from suit in the United States simply because each state makes up only a fraction of the substantial nationwide market for the offending product." Id. at 728. Otherwise, a foreign corporation "could commit serious torts or contract breaches without ever having enough contacts with any one forum to give those injured an opportunity to seek redress." Centronics Data Computer Corp. v. Mannesmann, A.G., supra, 432 F.Supp. at 664. Thus, although the theory has not yet been generally accepted, and there is no specific statutory authority for it, see 4 Wright & Miller, Federal Practice and Procedure : Civil § 1075 at 304, n.29 (1976), it has been adopted by several courts. See Holt v. Klosters Rederi A/S, 355 F.Supp. 354 (W.D.Mich.1973); Cryomedics, Inc. v. Spembly, Ltd., 397 F.Supp. 287 (D.Conn.1975); Centronics, supra; Amburn, supra. See also Wells Fargo and Co. v. Wells Fargo Express Company, 556 F.2d 406 (9th Cir. 1977) (aggregating contacts may be proper when a federal statute such as § 12 of the Clayton Act authorizes worldwide service of process); Moriarty, supra (decided on other grounds).
 
 
 47
 The present case, however, does not require us to decide whether the "aggregate contacts" theory is consistent with the due process clause of the Fifth Amendment. Even if we were to hold that nonforum contacts can properly support personal jurisdiction over an alien defendant in antitrust actions, Chrysler has failed to establish that Interclisa has sufficient contacts with the United States as a whole.
 
 
 48
 The test for determining the sufficiency of the nexus between the forum and the defendant was formulated by the Supreme Court in Hanson v. Denkla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958):
 
 
 49
 The application of (the) rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. Id. at 253, 78 S.Ct. at 1239.
 
 
 50
 The uncontroverted affidavits submitted by Interclisa in support of its motion to dismiss establish that Interclisa has never: qualified to do business anywhere in the United States; maintained an office or warehouse, or owned or leased any real or personal property in the United States; sold any of its products in or for distribution in the United States; hired any employees or representatives in the United States; or borrowed any money in the United States.
 
 
 51
 Chrysler contends that Interclisa's purchases of American parts for its air-conditioning products and its use of technology originating in the United States constitute sufficient contacts for jurisdictional purposes.[4] We hold that these allegations are insufficient to support the exercise of personal jurisdiction. Interclisa's alleged purchases are unrelated to the events giving rise to this litigation. Moreover, there is no indication of how many, if any, purchases were actually made, or whether such purchases represent a substantial portion of Interclisa's parts supply. Compare Crusader Marine Corp. v. Chrysler Corp., 281 F.Supp. 802 (E.D.Mich.1968) with Eastern Pre-Cast Corp. v. Giant Portland Cement Co., 311 F.Supp. 896 (E.D.Pa.1970). Under these circumstances we must conclude that Interclisa lacks sufficient minimum contacts with the United States, and that maintenance of this action against it would offend "traditional notions of fair play and substantial justice." International Shoe, supra.
 
 
 52
 Finally, Chrysler asserts that it should at least have been permitted to conduct discovery concerning jurisdictional facts, and that the District Court's refusal to do so was error.
 
 
 53
 We agree that discovery may be appropriate when a defendant moves to dismiss for lack of jurisdiction. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (2d Cir. 1972). However, it is well established that the scope of discovery is within the sound discretion of the trial court. See, e. g., H. K. Porter Co., Inc. v. Goodyear Tire and Rubber Co., 536 F.2d 1115 (6th Cir. 1976). A ruling by the trial court limiting or denying discovery will not be cause for reversal unless an abuse of discretion is shown. Federal Rule of Civil Procedure 26(b); H. L. Moore Drug Exch., Inc. v. Smith, Kline and French Laboratories, 384 F.2d 97 (2d Cir. 1967).
 
 
 54
 Inasmuch as Chrysler failed to offer any factual basis for its allegations of conspiracy, it was well within the trial court's discretion to deny Chrysler's request for discovery. We reach the same conclusion with respect to Chrysler's allegation that Interclisa made purchases in the United States. The District Court expressly found that there is no reasonable basis to expect that further discovery would reveal contacts sufficient to support personal jurisdiction. See Budde v. Ling-Tempco-Vought, Inc., 511 F.2d 1033, 1035 (10th Cir. 1975). Although it may have been advisable for the District Court to grant Chrysler's request to conduct discovery, we cannot say that its refusal to do so was an abuse of discretion.
 
 
 55
 Accordingly, the judgment of the District Court is affirmed in part and reversed in part. The case is remanded for proceedings consistent with this opinion.
 
 
 
 [1]
 But see Mid-West Paper Products Co. v. Continental Group, Inc., 596 F.2d 573 (3rd Cir. 1979), which treats antitrust injury and standing as related but analytically distinct aspects of the "problem of determining when a person is sufficiently 'injured in his business or property by reason of anything forbidden in the antitrust laws.' " Id. at 582. See also Handler, Changing Trends in Antitrust Doctrines: An Unprecedented Supreme Court Term 1977, 77 Col.L.Rev. 979, 994-97 (1977)
 
 
 [2]
 This aspect of the court's decision was vacated on appeal to permit further discovery as to jurisdictional facts. Leasco Data Processing Equipment Corp. v. Maxwell, 468 F.2d 1326 (1972). See p. ---- infra
 
 
 [3]
 Of course, Congress or the Supreme Court may impose restrictions on the in personam power of federal courts. These restrictions may be found in venue statutes, the Federal Rules of Civil Procedure, and in the federal statutes under which the plaintiff brings his action
 In this case, Chrysler claims that venue is proper under 28 U.S.C. § 1391(d), which provides that an alien may be sued in any district. It further asserts that service of process is authorized by the second clause of § 12 of the Clayton Act, notwithstanding Chrysler's inability to satisfy the venue provisions in the first clause of that section.
 Section 12 provides:
 Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.
 Interclisa, on the other hand, argues in its brief that the service of process provision in the second clause of § 12 is available only when the forum contact requirements of the first clause are met. We need not decide this question because, as Chrysler points out, Interclisa's failure to object to service of process or venue in its Rule 12(b) motion below constitutes a waiver of any such objection here. Federal Rules of Civil Procedure, Rule 12(h).
 However, the existence of proper venue is not enough, in itself, for in personam jurisdiction to result from extra-territorial service of process. Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974). In order to obtain personal jurisdiction, the plaintiff has the burden of establishing that the defendant has had such minimal contacts with the forum that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. International Shoe, supra.
 
 
 [4]
 Chrysler further alleges that Interclisa's denials are "pregnant with admissions" of other contacts such as product sales within the United States. We decline to draw such inferences and note that the first Calzada affidavit explicitly denies that Interclisa has sold any of its products in or for distribution in the United States