**DUNHAM'S, INC., Plaintiff,**

v.

**NATIONAL BUYING SYNDICATE OF TEXAS, a Texas Corporation, Michigan Sporting Goods Distributors, Inc., a Michigan Corporation, Figgine International Company, an Ohio Corporation, jointly and severally, Defendants.**

**No. 84–CV–3331–DT.**

United States District Court, E.D. Michigan, S.D.

March 28, 1985.

William J. Lamping, Birmingham, Mich., Robert V. Seymour, Southfield, Mich., Carl F. Erickson, Birmingham, Mich., for plaintiff.

Michael H. Jacobson, McShane & Bowie, Grand Rapids, Mich., John G. Truelson, Fort Worth, Tex., John J. Lynch, Birmingham, Mich., Walter O. Koch, Bodman, Longley & Dahling, Troy, Mich., Kenneth Peterson, Akron, Ohio, for defendants.

## MEMORANDUM OPINION AND ORDER

PHILIP PRATT, District Judge.

The question presented is whether this court has personal jurisdiction over a nonresident corporate defendant—National Buying Syndicate of Texas (NBS).

### I.

This is an antitrust case. The plaintiff here, Dunham's Inc., a Michigan corporation, is a retail seller of sporting goods. Three separate defendants are named:

NBS, a Texas corporation; Michigan Sporting Goods Distributors, Inc. (MC Sporting Goods), a Michigan corporation; and Figgie International Company, an Ohio corporation.[1]

Plaintiff commenced this action on July 19, 1984, alleging violations of the Sherman Act, 15 U.S.C. §§ 1, 4, 5, the Clayton Act, 15 U.S.C. § 16, and the Robinson-Patman Act, 15 U.S.C. § 13. It is alleged that the defendants conspired and participated in unlawful price discrimination and restraint of trade.

## II.

NBS operates a syndicate or buying group composed of various sporting goods retailers throughout the United States. NBS advertises that it has members in 47 states. The buying syndicate operates in the following manner. It purchases, or arranges for purchases, of sporting goods merchandise between manufacturers or wholesalers and members of the NBS buying syndicate. These purchases are made in large quantity at discounted prices. Therefore, NBS members are able to buy these goods at prices less than what they would have to pay wholesalers in the normal course of their business. By obtaining merchandise at discount prices, NBS members are able to sell their goods at more competitive prices while still making an attractive profit. In short, NBS's operation apparently offers members the opportunity to buy merchandise at lower than normal prices and thereby gain a competitive advantage in the marketplace over non-NBS member retailers.

It is essential to understand NBS's mode of operation insofar as it can be gleaned from the parties' submissions. A letter and brochure sent to plaintiff by NBS on December 28, 1983 explains the NBS membership requirements and operations. Plaintiff's Exhibit A. NBS members are required to pay a one-time initiation fee of $1,000. In addition to this, members must pay monthly dues of $175. There are also certain registration fees of $150 per member.

In addition to the dues obligations of a member, NBS has established financial criteria which must be satisfied before NBS membership is granted. These include a satisfactory Dun & Bradstreet financial rating, a minimum level of retail sales in sporting goods merchandise and several other requirements. NBS members purchase most of their merchandise during semi-annual buying markets held in Fort Worth, Texas. Vendors that represent manufacturers and wholesalers of sporting goods equipment exhibit and sell their goods at these shows.

When NBS members order merchandise, they are required to use "NBS purchase orders for all Syndicate orders." According to NBS procedures, the NBS office in Fort Worth must be sent a copy of all purchase orders on a weekly basis. Additionally, copies of all correspondence or letters "related to Syndicate orders" must be sent to the NBS office once a week. Plaintiff's Exhibit E.

With standard NBS sales, the vendor bills all merchandise to NBS. The merchandise itself, however, is drop-shipped to the ordering member. In turn, the member then pays the vendor directly rather than going through NBS. Plaintiff's Exhibit E. On occasion, with what NBS calls "exceptional deals," merchandise will be shipped to one of the NBS warehouses.[2] When this is done, the merchandise is then reshipped to NBS members which have ordered the goods. NBS itself must pay for these "exceptional deals" with its own check. Members must then reimburse NBS for these goods directly instead of paying the vendor.

---

1. A fourth defendant was initially named in this matter, Penn Athletic Products Co., an Ohio corporation. Penn Athletic has since been dismissed as a defendant in this action per stipulation of the parties.

2. NBS's warehouses are located at Manning's in Fort Worth, Sportsman's Den in Hixson, Tennessee, Big Bear Stores in Billings, Montana, and Mel Cotton's in San Jose, California.

Plaintiff applied for NBS membership in December of 1983. Its application was denied. Plaintiff contends:

Acting pursuant to Defendant Syndicate's policies and practices ... and in combination and conspiracy with other persons including, without limitation, retailers who are members of Defendant Syndicate, Defendant Syndicate denied, excluded and barred Plaintiff Dunham's from membership in Defendant Syndicate.

As a direct and proximate result of being denied, vetoed and barred from membership in Defendant Syndicate, Plaintiff Dunham's has been denied the benefits of such membership, including without limitation, the extremely large and extraordinary price and volume discounts, reduced prices, favorable terms and other benefits ... and Plaintiff Dunham's has been limited, restrained and injured in its ability to compete.

Plaintiff seeks both money damages and equitable relief for defendants' alleged antitrust violations.

### III.

This matter is now before the court on defendant NBS's motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(2), (5), on the ground that this court lacks personal jurisdiction over it because the requisite minimum contacts do not exist with the forum state.[3]

It is plaintiff's position that the requirement of "minimum contacts" is irrelevant when subject matter jurisdiction is based on a federal statute rather than on diversity of citizenship. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1956). Defendant, on the other hand, contends that this court must engage in some type of "minimum. contacts" analysis to determine whether NBS is amenable to suit in the forum state.

In *International Shoe* and its progeny, *McGee v. International Life Insurance Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), and *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). The U.S. Supreme Court articulated the constitutional due process limitations on *in personam* jurisdiction. These cases state that a nonresident defendant's contacts or ties with the forum state must make it "reasonable and just" to permit that state to exercise jurisdiction over the defendant. *International Shoe*, 326 U.S. at 320, 66 S.Ct. at 160. The fourteenth amendment's due process clause limits a state's jurisdiction over nonresident defendants to those situations in which exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158 (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940)).

██ If jurisdiction in this case had been predicated on diversity of citizenship pursuant to 28 U.S.C. § 1332, there would have been no argument from counsel that an *International Shoe* "minimum contacts" analysis would be necessary. But jurisdiction here is based on federal antitrust statutes, *supra*. The parties' disagreement on the "minimum contacts" question is further complicated by the fact that in an antitrust action, nationwide service of process is permitted on corporate defendants. 15 U.S.C. § 22. Therefore, the question this court must decide is whether an *International Shoe* minimum contacts analysis must be undertaken when jurisdiction is predicated on federal antitrust statutes and nationwide service of process is provided for over the corporate defendants.

This question has generated much debate among the courts and scholars. *See generally*, Hovenkamp, Personal Jurisdiction and Venue in Private Antitrust Actions in the

---

**3.** Defendant initially challenged the service of process made on one of NBS' corporate officers. During oral arguments on defendant's motion, it conceded that service was proper pursuant to Fed.R.Civ.P. 4(d)(3). Defendant's motion to quash service of process was, therefore, withdrawn by counsel.

Federal Courts: A Policy Analysis, 67 *Iowa L.Rev.* 485, 487 (1982). Note, Alien Corporations and Aggregate Contacts: A Genuinely Federal Jurisdictional Standard, 95 *Harv.L.Rev.*, 470 (1981).[4] The Supreme Court has not addressed this issue. In *United States v. Scophony Corp.*, 333 U.S. 795, 68 S.Ct. 855, 92 L.Ed. 1091 (1948), the Court noted that it would not define the outer limits of Congress' authority to compel a defendant to defend a suit in a distant forum. *Id.* at 804, 68 S.Ct. at 860. The Court said:

> [T]he government, however, suggests that, in view of our recent decision in *International Shoe* [citation omitted] which was concerned with the jurisdiction of a state over a foreign corporation for purposes of suit ..., and in view of aspects of similarity between that problem and the one now presented, we extend to this case and to § 12 [Clayton Act] the criteria there formulated and applied. There is no necessity for doing so ... [W]e are not concerned here with finding the utmost reach of Congress' power.

*Id.* at 804 n. 13, 68 S.Ct. at 860 n. 13.

In the years following *Scophony,* federal courts have faced this issue with considerable uncertainty. The results, understandably, have been inconsistent. *See generally, Superior Coal Co. v. Ruhrkohle, A.G.,* 83 F.R.D. 414, 418 (E.D.Pa.1979); *Logiurato v. Action,* 490 F.Supp. 84, 89–90 (D.D.C. 1980); *Edward J. Moriarty & Co. v. General Tire & Rubber Co.,* 289 F.Supp. 381, 390 (S.D.Ohio 1967); *Lone Star Package Car Co. v. Baltimore and Ohio Ry. Co.,* 212 F.2d 147, 155 (5th Cir.1954).

The Sixth Circuit Court of Appeals spoke to the personal jurisdiction issue in federal question cases in *Haile v. Henderson National Bank,* 657 F.2d 816 (6th Cir.), *cert. denied,* 455 U.S. 1172, 102 S.Ct. 1450, 71 L.Ed.2d 663 (1981). The court determined that the *International Shoe* minimum contacts analysis "becomes inapposite" when Congress has provided for nationwide service of process. 657 F.2d at 826 n. 10. At issue in *Haile* was "whether the minimum contacts analysis of *International Shoe* [citation omitted] and its progeny properly applies to ancillary actions and proceedings brought by a federal receiver ..." *Id.* at 817.

The court reviewed the traditional two-step analysis whereby federal courts sitting in diversity first determine whether a state long-arm service of process exists, and then whether requiring the defendant to appear in the forum is consistent with due process principles. *Id.* at 822. Further, the court said it was unable to find any cases applying the minimum contact-due process test in situations involving federal receivership statutes and nonresident defendants. In making its ruling, the court's rationale was based on the fact that an ancillary receivership action does not involve a court attempting to extend its power beyond its own territorial limitations through a state's long-arm statute. Instead, the court reasoned, a different analysis must be applied.

> First, an ancillary receivership action is not an exercise of extra-territorial jurisdiction; and second, the territorial limits of the appointment court's effective service of process are extended to any district to which its territorial jurisdiction has been expanded by *the presence in that district of property belonging to the receivership estate* [emphasis added].

*Id.* at 823.

The Sixth Circuit's analysis in *Haile* was based, in large part, on the First Circuit

**4.** The Fifth Circuit in *Black v. Acme Markets,* 564 F.2d 681 (5th Cir.1977), in refusing to get involved in this "vexed" question, opined:

> A decision of this Circuit early in the *International Shoe* era indicates that the *Shoe* fits and is to be worn by federal courts perambulating through anti-trust cases [citation omitted]. In any event, no one has suggested that the personal jurisdiction of federal courts is to be gauged by more restrictive constitutional standards than that applicable to state courts. State long-arms must fit into an *International Shoe*; there is no justification for forcing federal feet into a glass slipper too narrow and fragile to support the weight of the policies underlying the statutory privilege of world-wide service.

*Id.* at 686 n. 8.

case of *Driver v. Helms*, 74 F.R.D. 382, (D.R.I.1977), *modified on other grounds*, 577 F.2d 147 (1st Cir.1978), *cert. denied*, 439 U.S. 1114, 99 S.Ct. 1016, 59 L.Ed.2d 72 (1978). In that case, defendants, who were nonresidents, were served under a nationwide service of process statute, 28 U.S.C. § 1391(e). Defendants argued that the court could not exercise its personal jurisdiction over them based on due process grounds. While rejecting this argument, the court said that since Congress specifically authorized personal jurisdiction over defendants located anywhere in the United States in 28 U.S.C. § 1391(e), personal jurisdiction over the defendants was proper. A portion of the district court opinion, not reversed by the First Circuit, is especially pertinent to the question presented in the present case. In relevant part, the court stated:

> However, Congress may provide for national service of process, i.e., national exercise of personal jurisdiction by each of the district courts based on presence of the defendant in the United States, rather than in any particular state. [citations omitted]. When Congress does so provide, the district court's service is not constrained by the due process (*International Shoe, Hanson v. Denckla*) limits to which state courts are subject. [citation omitted]. Instead, the due process limitation on national service of process is found by inquiring into the fairness of such jurisdiction in the particular circumstances and facts of the case at hand, an inquiry mandated by the Fifth Amendment Due Process Clause.
>
> The Court believes that the exercise of national personal jurisdiction pursuant to § 1391(e) here is consistent with the applicable due process test. In *Mariash v. Morill* [496 F.2d 1138 (2nd Cir.1974)] ... the Second Circuit held that Congressionally authorized national jurisdiction satisfied due process if it was based on service calculated to inform the defendant

of the proceeding in order that he may take advantage of the opportunity to be heard. As Chief Judge Kaufman noted ... nationwide service of process, when authorized by Congress, is not extra-territorial at all. Therefore, the due process limitation on such process should be precisely the limitations applicable on a state's process within its territorial limits: notice calculated to inform the defendant of the pendency of the suit. [citation omitted].

74 F.R.D. at 390–91.

Under this rationale, the *Haile* court concluded that the proper inquiry is whether service was "reasonably calculated" to inform the defendants of the action against them so that they might have an opportunity to be heard, rather than an analysis under the *International Shoe* line of cases. The court held: "In an action where service of process is effected pursuant to a federal statute which provides for nationwide service of process, the strictures of *International Shoe* do not apply." 657 F.2d at 824. Because the statute involved in *Haile*, 28 U.S.C. § 1692, provided for nationwide service of process,[5] the court's process extended to any district where receivership property could be found. "As such," the court stated, "the minimum contacts analysis, as a limitation on state extra-territorial power, is simply inapposite." 657 F.2d at 825–26.

The crucial distinction between *Haile* and the present case is that *Haile* involved a nationwide service of process statute which was based on the presence of receivership property in the jurisdiction. Such a statute is not before the court in the present case. Instead, section 12 of the Clayton Act must be evaluated under the analysis set forth in *Haile*. Section 12 provides that venue in an antitrust action is proper "not only in the judicial district whereof it [defendant corporation] is an inhabitant, but also in

---

5. 28 U.S.C. § 1692 provides:

In proceedings in a district court where a receiver is appointed for property, real, personal, or mixed situated in different districts,

process may issue and be executed in any such district as if the property lay wholly in one district, ...

any district wherein it may be found or transacts business ..." 15 U.S.C. § 22.

A second, though related, distinction must also be noted. *Haile* involved an ancillary receivership action. In contrast, the violations alleged here relate to unfair competition and price discrimination—alleged violations of the antitrust laws. The nature or pervasiveness of the injuries alleged in the present case are fundamentally different from those in *Haile.* Unlike other kinds of finite injuries, the effect of an antitrust violation is not limited to the parties involved in a given transaction. By its own nature, an antitrust violation is more pervasive and intrusive than almost any other type of legal wrong. An underlying concern is the public interest. The welfare of the public as it relates to free competition in the marketplace is vital with any antitrust injury. The sort of injury caused by an antitrust violation played a major factor in the promulgation of section 12 of the Clayton Act. *See generally Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

In addition to the reasoning and distinctions involved with the *Haile* case, the Sixth Circuit's analysis in *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981) is also instructive. Here the court recognized that jurisdiction over a nonresident corporate defendant being sued on a federal cause of action may be "founded on the corporation's contacts with the United States as a whole as opposed to its contacts with the forum state." 643 F.2d at 1237.

The suit in *Chrysler* was brought under the Clayton Act, as in the present case, where nationwide service of process is provided for under section 12. "It may be neither unfair nor unreasonable as a matter of due process [fifth amendment] to aggregate the nonforum contacts of an alien corporate defendant in order to establish personal jurisdiction." 643 F.2d at 1238. The court did not reach this issue because it was not determined whether the defendant had sufficient contacts with the United States as a whole to support exercise of personal jurisdiction. *Id.* at 1238–39. Acknowledging that several courts have adopted this aggregate contacts theory of personal jurisdiction, the Sixth Circuit noted that there is no specific statutory authority for it and declined to decide "whether the 'aggregate contacts' theory is consistent with the due process of the Fifth Amendment." *Id.*

If, however, such an aggregate or nonforum contact analysis applied to the present case, there would be no question that NBS had "minimum contacts" with the United States as a whole, so as to satisfy due process requirements under the fifth amendment. By its own admission, NBS has syndicate members in 47 states; it is incorporated under the laws of Texas; it operates its business in Fort Worth; it has employees in Fort Worth; NBS warehouses are located in several other jurisdictions; it conducts semi-annual buying shows in Fort Worth and members from the various states attend those shows for buying purposes; and the corporate functions of NBS are apparently based in Fort Worth. It is doubtful that NBS would contend that it did not have minimum contacts with the United States as a whole.

The most recent word from the Sixth Circuit on this question is *Handley v. Indiana & Michigan Electric Co.,* 732 F.2d 1265 (6th Cir.1984). In that case, the court conceded that the personal jurisdiction issue arises generally when subject matter jurisdiction is based on diversity of citizenship. But when the personal jurisdiction of a federal court over a nonresident of the forum state is challenged in which subject matter jurisdiction is based on a federal statute, "a different inquiry must be made." 732 F.2d at 1268. The court said:

As part of a national system of courts a federal district court considering a case that arises under federal law is not subject to precisely the same due process limitations which restrict its reach in diversity cases. It is clear, however, that Rule 4, Fed.R.Civ.P., affects personal

jurisdiction of district courts by placing territorial limits on their process.

*Id.*

Unlike the instant case, the action in *Handley* was based on the Jones Act and general maritime law. The Jones Act does not have a provision for nationwide service, such as the Clayton Act; therefore the court borrowed the forum state's long arm statute and applied a minimum contacts analysis. 732 F.2d at 1270. Thus, *Handley* is not precisely on point.

Although the *Haile* decision, *supra,* by which this court is bound, has been disfavored by commentators,[6] its teachings apply to the present case. In a federal antitrust action, such as here, the court's determination concerning personal jurisdiction is guided by the national standards of due process under the fifth amendment. An *International Shoe* "minimum contacts" analysis need not be performed under these circumstances. *Haile,* 657 F.2d at 824. The pertinent inquiry here is whether service was reasonably calculated to inform defendants of the pendency of the action against them so that they would have an opportunity to present a defense to the charges pending. *Haile,* 657 F.2d at 826, *Mullane v. Central Hanover Bank and Trust,* 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In order to give proper notice, service of process must be made in a manner consistent with Rule 4, Fed.R.Civ.P. When Congress provides a statutory basis for nationwide service of process, such as section 12 of the Clayton Act, and does not provide the specific manner of service, Rule 4(e) states that service may be made "in a manner stated in this rule."

Section 12 of the Clayton Act codified at 15 U.S.C. § 22, provides for venue and nationwide service of process. It states:

Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found.

The statute does not expressly mention the exercise of personal jurisdiction. It has, however, been interpreted to permit federal courts to exercise personal jurisdiction over defendants located in the United States. *Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distributors Pty, Ltd.,* 647 F.2d 200, 204 n. 6. (D.C.Cir.1981); *U.S. v. Asbestos Corp.,* 34 F.2d 182 (2d Cir.1929)

Defendant NBS does not challenge the manner of service in this matter. It is uncontested that it had notice of these proceedings and an opportunity to present its defenses to the action pending.

## IV.

The remaining question is whether suit may be brought against NBS in the Eastern District of Michigan. The resolution of this issue turns on whether NBS "transacts business" within the district.

When analyzing the "transacting business" portion of section 12, the starting point is *Eastman Kodak Co. v. Southern Photo Materials Co.,* 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927). Here the Court explained the underpinnings of the "transacting business" test.

[T]his section ... reliev[es] the injured person from the necessity of resorting for the redress of wrongs committed by a non-resident corporation, to a district, however distant, in which it resides or may be "found"—often an insuperable obstacle—and enabling him to institute the suit in a district, frequently that of his own residence, in which the corporation in fact transacts business, and bring it before the court by the service of process in a district in which it resides or may be "found."

---

**6.** For example, *see,* Fullerton, Constitutional Limits on Personal Jurisdiction in the Federal Courts, 79 *NW.U.L.Rev.* 3, 16–22 (1984) ("The appellate opinions [*Haile* ] evince a common disregard for the burdens that distant litigation can impose on defendants.").

*Id.* at 373–74, 47 S.Ct. at 403–404. In interpreting the *Eastman Kodak case,* the Court stated that section 12 "substitut[ed] practical, business conceptions for the previous hair-splitting legal technicalities ..." *United States v. Scophony,* 333 U.S. 795, 808, 68 S.Ct. 855, 862, 92 L.Ed. 1091 (1947).

■ In cases decided since *Eastman Kodak* and *Scophony,* it has been made clear that the phrase "transacts business" has a broader, more expansive definition than terms such as "doing business" or "carrying on business." *Crusader Marine Corp. v. Chrysler Corp.,* 281 F.Supp. 802, 803–04 (E.D.Mich.1968) (J. Levin). A number of principles have developed since *Scophony* which bear on the present case. Purchasing activity, as well as sales activity, has been held to constitute the transaction of business within section 12 of the Clayton Act. *Black v. Acme Markets Inc.,* 564 F.2d 681, 687 (5th Cir.1977); *Board of County Comm'rs v. Wilshire Oil Co. of Texas,* 523 F.2d 125, 129–30 (10th Cir.1975); *Crusader Marine Corp.,* 281 F.Supp. at 804.

■ In addition, the amount of the business transacted must be judged from the "standpoint of the average businessman" rather than from the perspective of a large corporation. In *In Re Chicken Antitrust Litigation,* 407 F.Supp. 1285 (N.D.Ga. 1975), the court said that when determining whether a defendant transacts business within the district, the amount of business must be viewed without comparison to the total volume of business done by the defendant corporation. *Id.* at 1291. *See also Green v. U.S. Chewing Gum Mfg. Co.,* 224 F.2d 369 (5th Cir.1955).

■ Furthermore, the activities which constitute the transaction of business need not be related to the subject matter of the litigation. *King v. Johnson Wax Associates, Inc.,* 565 F.Supp. 711 (D.C.Md.1983); *In Re Chicken Antitrust Litigation,* 407 F.Supp. at 1292. *McCory v. Cloth World, Inc.,* 378 F.Supp. 322 (S.D.N.Y.1974); *National Auto Brokers Corp. v. General Motors Corp.,* 332 F.Supp. 280 (S.D.N.Y.1971); *Crusader Marine Corp.,* 281 F.Supp. at

802. Then, too, it is generally held that the concept of "transacting business" is more lenient than that of "minimum contacts" under *International Shoe. Athletes Foot of Delaware, Inc. v. Ralph Libonati Co.,* 445 F.Supp. 35, 45 (D.Del.1977). *But see Cascade Steel Rolling Mills v. Itoh & Co.,* 499 F.Supp. 829, 835 (D.Or.1980); *Smokey's of Tulsa, Inc. v. American Honda Motor Co.,* 453 F.Supp. 1265 (E.D.Okla. 1978).

With these rather general guidelines in mind, the substantiality of the defendants' business within the Eastern District of Michigan must be evaluated. This presents the court with a difficult question. Counsel for the parties have submitted contradictory affidavits on this point, while not addressing this question during oral arguments.

■ From the submissions of counsel, the court has been able to ascertain the following. Although NBS argues that it does not have any "employees, officers or agents stationed in the State of Michigan," much contrary evidence is submitted by plaintiff. In fact, NBS's own letterhead lists Mort Finkelstein of Grand Rapids, Michigan as an NBS buyer. A NBS brochure indicates that Mr. Finkelstein and Art Nasso, also of Grand Rapids, function as associate buyers for NBS. Plaintiff's Exhibit C.

The affidavit of Mr. Finkelstein is self-serving. He states that NBS does not transact business in Michigan. Further, he states that his position with NBS is limited to analyzing, reviewing and surveying sporting goods products. He does not state where and with whom his NBS duties are conducted. An affidavit of Raymond Schneider, President of Schneider's Sports, a Michigan corporation, describes Mr. Finkelstein's duties as more expansive. Mr. Schneider's stores are past members of the NBS syndicate. He stated that Mr. Finkelstein explores "the market to determine which manufacturers would cooperate with NBS ..." Additionally, Mr. Schneider said that Mr. Finkelstein obtained price and

term quotations from manufacturers whose merchandise would be offered to NBS members.

NBS's own admissions also suggest that it "transacts business" within this district. There are presently 17 NBS members within the state. According to NBS's guidelines, *supra,* members must keep the NBS office in Fort Worth apprised of all relevant transactions by sending it copies or purchase orders and other pertinent documents. Plaintiff's Exhibit E. This involves a constant flow of paperwork from member outlets in the Eastern District of Michigan to NBS headquarters in Fort Worth.

Another factor showing the transaction of business here is the dues and commissions NBS receives from area members. As discussed *supra,* NBS members must pay a $1,000 initiation fee, a $175 monthly dues payment, and several other fees which benefit NBS. The substantiality of the fees NBS receives from Michigan members, although not dispositive, is an important consideration. *In Re Chicken Antitrust Litigation,* 407 F.Supp. at 1292.

In addition, there are also indications that manufacturers which sold sporting goods to NBS members are located within the Eastern District of Michigan.

Given these factors, the conclusion is inescapable that NBS "transacts business" here within the meaning of section 12 of the Clayton Act.

Accordingly, defendant's motion is denied.

IT IS SO ORDERED.